**T.A.B. SYSTEMS, Appellant,**

v.

**PACTEL TELETRAC, Appellee.**

No. 95–1102.

United States Court of Appeals,
Federal Circuit.

Feb. 28, 1996.

R. Joseph Trojan, Trojan Law Offices, Beverly Hills, California, argued, for appellant.

Melvyn B. Fliegel and Katherine McDaniel, Alschuler, Grossman & Pines, Los Angeles, California, argued, for appellee.

Before ARCHER, Chief Judge, MICHEL and RADER, Circuit Judges.

MICHEL, Circuit Judge.

T.A.B. Systems (T.A.B.) filed this timely appeal from the August 29, 1994 decision of the Trademark Trial and Appeal Board (Board) sustaining PacTel Teletrac's (PacTel) opposition to registration of T.A.B.'s mark, TELETRAK, on the Principal Register. *PacTel Teletrac v. T.A.B. Sys.*, 32 USPQ2d 1668 (TTAB 1994). The Board granted PacTel's motion for summary judgment, concluding that the undisputed evidence of record clearly established that PacTel had used the designation TELETRAC in a manner analogous to service mark use prior to T.A.B.'s earliest-claimed priority date. The appeal was argued on October 31, 1995. Because the undisputed evidence of record does not establish that PacTel is entitled to judgment as a matter of law on the basis of prior analogous use, we vacate the Board's decision and remand the case for further proceedings consistent with this opinion.

BACKGROUND

PacTel provides vehicle fleet tracking and lost vehicle recovery services under the TELETRAC mark. PacTel's services use satellites to track motor vehicles within a set geographic area. T.A.B. offers a similar lost and found retrieval service under the TELETRAK mark. T.A.B.'s subscribers place tags on their property, each tag bearing a registration number and a "1–800" telephone number. Any person who finds an item lost by a subscriber can call the telephone number on the tag to report the item's recovery. T.A.B. then contacts the subscriber to arrange for the return of the item.

T.A.B. filed an application to register the TELETRAK mark in February 1991. Pac-

Tel opposed the application, alleging (a) that it had used the term TELETRAC in a manner analogous to a service mark since June 2, 1989, and as an actual service mark since November 1, 1990; (b) that both these dates were prior to T.A.B.'s actual date of first use in commerce, or any other date on which T.A.B. could rely for priority purposes; and (c) that there is a likelihood of confusion between the parties' marks as applied to their respective services.[1] *Id.* at 1669. T.A.B. conceded the existence of a likelihood of confusion but contested PacTel's assertion of priority rights in the TELETRAC mark sufficient to bar registration of T.A.B.'s mark. Specifically, T.A.B. argued (a) that its October 1989 post card mailing to a national sample of locksmiths was a valid "use in commerce" giving T.A.B. priority over PacTel's November 1990 service mark use; (b) that PacTel could not rely on a "prior analogous use" theory because it was not yet rendering the tracking services during the period of allegedly analogous use; and (c) that, if the theory were available to PacTel, its use of the term TELETRAC in 1989 was, *inter alia*, insufficiently "open and notorious" to create proprietary rights therein. *Id.* at 1670.

Disposing of the case on cross-motions for summary judgment, the Board concluded that PacTel had used the TELETRAC mark in a manner analogous to service mark use since June 1989, thereby giving PacTel a priority date earlier than T.A.B.'s earliest priority date (*i.e.*, October 1989). First, after a detailed review of its prior decisions in the analogous use area, the Board rejected T.A.B.'s contention that PacTel could not make out ˙ analogous use during a period when it provided no services. According to the Board, "[c]ommercial availability of the services is not a legal prerequisite to a claim of analogous use priority; the existence of such priority depends on the facts of each case." *Id.* at 1674. Next, the Board rehearsed the following undisputed facts per-

1. As the Board noted, PacTel raised the allegation of likelihood of confusion for purposes of the opposition alone. *PacTel Teletrac v. T.A.B. Sys.*, 32 USPQ2d 1668, 1669 n. 4 (TTAB 1994). PacTel filed two service mark applications connected with the TELETRAC mark *after* T.A.B. filed the application now in suit. The examining attorney indicated that those applications may be refused in the event that T.A.B.'s application results in a registration. As a result, PacTel's applications have been suspended pending the outcome of this proceeding. *Id.*

taining to PacTel's use of the term TELET-RAC: (a) Location Technologies, the joint venture formed to provide vehicle tracking service, was renamed PacTel Teletrac in June 1989; (b) PacTel issued press releases in July 1989, each of which bore the PacTel logo and the word TELETRAC in the upper right corner and described the forthcoming vehicle tracking service; (c) the press kits within which the press releases appeared, distributed to 300 news organizations and potential customers, were contained in a grey folder with the word TELETRAC embossed in red on the front cover; (d) at least one news service, BusinessWire, circulated the press release nationally; (e) PacTel made slide show marketing presentations to seven potential vehicle fleet customers by October 1989, the slides of which contained the word TELETRAC in the upper left corner in red lettering; (f) PacTel maintained a booth at a trade show in August 1989 under the banner "International Teletrac Systems," once again in red lettering; (g) PacTel distributed marketing brochures in September 1989, each of which bore the words "INTERNATIONAL **TELETRAC** SYSTEMS"; and (h) eleven articles reporting on the vehicle tracking service and referring to PacTel Teletrac and International Teletrac Systems as the providers appeared in general circulation newspapers and trade publications between September 10 and October 23, 1989. *Id.* at 1671–72. Rejecting T.A.B.'s contention that the evidence of PacTel's use of TELETRAC, while uncontroverted, was legally insufficient to establish prior analogous use, the Board concluded that PacTel "was using the term TELETRAC in a manner analogous to service mark use, i.e., in a manner intended to create an association in the mind of the relevant purchasing public between the mark, the services to be offered, and a single source," *id.* at 1675, and granted summary judgment accordingly.[2]

2.  Because the Board granted summary judgment on analogous use grounds alone, it expressly declined to address the question whether T.A.B.'s October 1989 post card mailing was a valid "use in commerce." *Id.* at 1671 ("Nor need we decide the parties' dispute as to whether applicant's post card mailing ... constituted 'use in commerce,' because even if it did, opposer's analo-

T.A.B. appeals from the Board's decision, contending that the Board erred in concluding that commercial availability of the underlying service is not a legal prerequisite to a claim of analogous use priority. Moreover, according to T.A.B., even if one assumes that commercial availability is *not* a prerequisite to an analogous use claim, PacTel's evidence of analogous use is legally insufficient to support the Board's conclusion that PacTel was entitled to a June 1989 priority date. We agree with the latter contention.

## STANDARD OF REVIEW

■ In reviewing whether the Board correctly granted PacTel's motion for summary judgment, we reapply the legal standard of Federal Rule of Civil Procedure 56(c) to the evidence of record, according to which summary judgment is proper where there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law. *Action Temporary Servs., Inc. v. Labor Force, Inc.*, 870 F.2d 1563, 1565, 10 USPQ2d 1307, 1308–09 (Fed.Cir.1989).

## ANALYSIS

■ Section 2(d) of the Lanham Act precludes the registration of a mark that so resembles a registered mark "or a mark or trade name previously used in the United States by another and not abandoned, as to be likely, when used on or in connection with the goods of the applicant, to cause confusion, or to cause mistake, or to deceive[.]" 15 U.S.C. § 1052(d) (1994). In an opposition founded on section 2(d), the opposer must establish its own prior proprietary rights in the same or a confusingly similar designation in order to defeat the application. *See generally* 3 J. THOMAS MCCARTHY, MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 20.04 (3d ed. 1994).

gous use predates that mailing and suffices to establish opposer's priority."). Likewise, the Board expressly declined to address the question whether PacTel had used TELETRAC as a trade name before October 1989. *Id.* ("[W]e need not and do not address opposer's claims based on priority of trade name use."). As a result, neither of these questions is before us on appeal.

■ It is well settled that one may ground one's opposition to an application on the prior use of a term in a manner analogous to service mark or trademark use. *See, e.g., Steer Inn Sys., Inc. v. Laughner's Drive–In, Inc.*, 405 F.2d 1401, 56 CCPA 911, 160 USPQ 626 (1969) (successful opposition to registration of service mark). Such an "analogous use" opposition can succeed, however, only where the analogous use is of such a nature and extent as to create public identification of the target term with the opposer's product or service. *See, e.g., National Cable Television Ass'n, Inc. v. American Cinema Editors, Inc.*, 937 F.2d 1572, 1578, 19 USPQ2d 1424, 1429 (Fed.Cir.1991) ("Prior public identification of petitioner with the name ACE for awards from use analogous to service mark usage is sufficient ground for cancellation."); *Malcolm Nicol & Co. v. Witco Corp.*, 881 F.2d 1063, 1065, 11 USPQ2d 1638, 1640 (Fed.Cir.1989) (affirming Board's determination that "Witco used 'BRITOL' in a way that created in the minds of people the necessary association between 'BRITOL' and the Witco product").

The cases on analogous use have not required that the opposer proffer survey evidence or other direct evidence of the consuming public's identification of the target word or phrase with the opposer as the source of a given product or service. Instead, the fact finder may infer the fact of identification on the basis of indirect evidence regarding the opposer's use of the word or phrase in advertising brochures, catalogs, newspaper ads, and articles in newspapers and trade publications. *See* McCarthy § 20.04[2], at 20–32 (collecting cases). Where, however, such indirect evidence falls short of supporting the critical inference of identification in the mind of the consuming public, we have not hesitated to reject an analogous use opposition. For example, in *Old Swiss House, Inc. v. Anheuser–Busch, Inc.*, 569 F.2d 1130, 196 USPQ 808 (CCPA 1978), the uncontradicted evidence of analogous use consisted of the following: "12 articles, each published only once, which appeared in various newspapers and trade journals between December 27,

1963, and April 1, 1964, and a single speech, on April 22, 1964, by one of [the user's] vice-presidents at a shareholders' meeting." *Id.* at 1133, 196 USPQ at 810. The court rejected the contention that the articles constituted analogous use sufficient to demonstrate prior proprietary rights in the target phrase. According to the court,

> [t]he articles ... were, in effect, press releases; in all but one, the mark, The Old Swiss House, was buried in the body of the articles. This, in our view, is not the type of public exposure of a mark that would be expected to have any significant impact on the purchasing public.

*Id.*

■ T.A.B. contends that PacTel, much like the opposer in *Old Swiss House*, has failed to adduce evidence legally sufficient to support the critical inference that the consuming public identified the word TELETRAC with a single source as the provider of vehicle tracking and location services prior to October 27, 1989.[3] We agree. We note, first, that PacTel's use of TELETRAC in various forms prior to June 1989 is simply irrelevant to its analogous use priority rights, inasmuch as neither the vehicle tracking service itself nor PacTel's connection to it was advertised in any way prior to June 1989. The remaining evidence, while relevant, does not support the necessary inference of public identification. Of the press releases PacTel issued, only one was shown to have been circulated by a national wire service. The record contains no evidence, however, to indicate how many of PacTel's potential consumers may have been reached by that wire service story. Although the record indicates that some of PacTel's press kits were distributed to potential customers, no evidence was presented enabling one to infer that a substantial share of the consuming public had been reached. Likewise with PacTel's slide show presentations to seven potential customers: we discern nothing in the record to indicate whether this group of customers constituted more than a negligible portion of the relevant market. Finally, the brochures

---

**3.** Because T.A.B. prevails on this contention, we assume, without deciding, that the commercial availability of its vehicle tracking service is not a legal prerequisite to PacTel's reliance on its analogous use of TELETRAC to establish priority over T.A.B.'s use of TELETRAK.

and news articles, all produced in September and October 1989, were not shown to have been so broadly or repetitively distributed that one could reasonably infer that the consuming public came to identify TELETRAC with PacTel's services by October 1989.[4] This record evidence, which does not permit one to infer either that PacTel reached more than a negligible share of potential customers or that the customers who *were* reached saw more than a few references to TELETRAC over a one or two month period, is legally insufficient to ground PacTel's analogous use claim.

An unbroken line of precedents of both this court and the Board make clear that activities claimed to constitute analogous use must have substantial impact on the purchasing public. For example, in *Computer Food Stores, Inc. v. Corner Store Franchises, Inc.,* 176 USPQ 535 (TTAB 1973), the Board ruled that, on the record before it, advertising that included a service mark before the service itself was available was sufficient to establish analogous use, but did so only after holding that analogous use "must be an *open and notorious public use* directed to the segment of the purchasing public for whom the services are intended, and must be used in a manner sufficient ... to inform or apprise prospective purchasers of the present or future availability of the adopter's service under the mark." *Id.* at 538 (emphasis added). That understanding of the law reflected the earlier decision of our predecessor court in *Jim Dandy Co. v. Martha White Foods, Inc.,* 458 F.2d 1397, 1399, 59 CCPA 1016, 173 USPQ 673, 674 (1972). In *Jim Dandy,* the court required that the analogous use effect popularization of the mark. *Id.* Our court itself later reaffirmed the vitality of the test, quoting from *Jim Dandy,* in *Malcolm Nicol & Co.,* noting that the prior advertising was required to be "of such a *nature and extent* that the term or slogan has become *popularized in the public mind.*" 881 F.2d at 1065, 11 USPQ2d at 1639 (emphasis added).

In subsequent cases our court has reviewed prior publicity of the type involved here to determine whether it was sufficiently clear, widespread and repetitive to create the required association in the minds of potential purchasers between the mark as an indicator of a particular source and the service to become available later. Sometimes the evidence was found sufficient, other times not.

Moreover, the test of sufficiency for analogous use of a mark was sometimes articulated differently from the Board phrase "open and notorious public use" from *Computer Food Stores* or our court's original phrase "popularized in the public mind" from *Jim Dandy.* Thus, as noted above, in *National Cable Television* we spoke of "prior public identification," 937 F.2d at 1578, and in *Malcolm Nicol & Co.* "creat[ing] in the minds of people *the necessary association.*" 881 F.2d at 1065, 11 USPQ2d at 1640 (emphasis added). Regardless of the particular verbal formulation, however, it is clear that the test is one and the same, and is directed at the actual perception of the potential consumers of the service, not some hypothetical person or the intent of the marketer. Thus, under any and all of the articulations of the test, it is actual public perception that is required.

■ Therefore, the Board in this case clearly misstated the law when it concluded that PacTel's advertising, media and sales efforts were sufficient for analogous use as "*intended to create* an association in the mind of the relevant purchasing public between the mark, the services to be offered, and a single source." 32 USPQ2d at 1675 (emphasis added). The user's intent, no matter how clearly established, cannot suffice in lieu of proof of the necessary "prior public identification."

It is true that the user is *also* required to establish intent to appropriate the mark, but we do not rely on insufficient proof of such intent. Rather, our disposition of this appeal is based on PacTel's insufficient proof that its publicity created "the necessary association," the "prior public identification," the "popularization in the public mind."

---

4. The information PacTel distributed showed the use of "Stolen Vehicle Locator Service," "Emergency Alert Service," and "Corporate Fleet Loca-tor Service" in connection with its proposed tracking service.

■ Nor can there be any doubt that purchaser perception must involve more than an insubstantial number of potential customers. For example, if the potential market for a given service were 10,000 persons, then advertising shown to have reached only 20 or 30 people as a matter of law could not suffice. However close the linkage between the mark and the future service, analogous use could not be shown on such facts because the actual number of potential customers reached, not the strength of the linkage for some "reasonable potential customer," is the focal point of the analogous use inquiry. As noted above, under *Old Swiss House,* what is required is "public exposure of a mark that would be expected to have any *significant impact* on the purchasing public." 569 F.2d at 1133 (emphasis added).

That is *not* to say that a fixed percentage, like 20%, much less 51%, of the potential customers must have formed in their mind the required "prior public identification." As we noted above, it simply requires "more than a negligible portion of the relevant market." In other words, advertising of sufficient clarity and repetition to create the required identification must have reached a substantial portion of the public that might be expected to purchase the service. Thus, the user must prove that the "necessary association" was created among more than an insubstantial number of potential customers. Otherwise, he cannot show "significant impact on the purchasing public."

It is true, for example, that seven vehicle fleet owners saw a slide show about PacTel's tracking service that included display of the mark. But, as we noted, in the absence of *any* proof by PacTel of the size of the market, it is simply impossible for us to conclude that seven customers was more than a negligible or insubstantial number. PacTel utterly failed to prove the size of the market. Moreover, since one of the competing and inconsistent marks it used during the same period, CORPORATE FLEET LOCATOR SERVICE, suggests that every corporation that has a fleet of cars falls within the relevant market, one can only assume that the market may include many thousands of companies. If, for example, PacTel had shown that its service was directed only to major car rental companies, then it might have established that the relevant market consisted of only a dozen or two potential customers, of which seven would clearly have been a substantial number. However, there was no such proof.

As noted above, survey evidence has never been required. Nothing we decide today in any way changes that established rule. In fact, however, in many cases lacking survey evidence, advertising programs and budgets are proven to support the inference of public identification. Significantly, no such evidence was produced here. We do not have any evidence that *any* air time or *any* newspaper space was purchased. No advertisements were shown to have been placed. We do not even have gross dollar figures on advertising expenditures. Nor do we have any indication of "readership."

That is not to say that advertising expenditures, any more than market surveys, are indispensable proof. Nevertheless, they are common forms of proof and often constitute legally sufficient evidence of analogous use. By contrast, here we have only the most limited evidence, and most of it concerns merely *attempts* to reach the public. Thus, we know that 300 press kits were prepared and distributed to news organizations and an indefinite number of potential customers, and that each kit contained a press release. But of the 300 kits, we have been shown no evidence that any media organizations in fact published or broadcast the information the release contained, with only one exception. As noted above, one national trade wire service carried one story. We also know that 11 articles appeared in various publications in September and October 1989, but those were not advertisements per se but news articles. Just as the "12 articles, each published only once, which appeared in various newspapers and trade journals [in a three-month period]" were found insufficient in *Old Swiss House,* 569 F.2d at 1133, so too are they insufficient here. Also, surprisingly missing from opposer's proofs was any information as to the distribution of its marketing brochure. There is no information as to where, when or to how many people it was given.

**1378**

With regard to its trade show in August 1989, PacTel's booth did not connect TELETRAC with the locator service. Nor can the prominent display on the banner at the trade show of "International Teletrac Systems" help, since company names are not recognized as service marks. In any event, no evidence at all was adduced that the purchasing public associated "International Teletrac Systems" with TELETRAC as a service mark. By contrast, in *National Cable Television,* the user proved both that the public associated A.C.E. with the film awards and with American Cinematic Editors as the source. 937 F.2d at 1574–75, 19 USPQ2d at 1426 ("Members are entitled to display the acronym 'A.C.E.' after their names which appear, for example, in the screen credits appended to television programs and motion picture films.... [O]thers, particularly the press, have long identified [the Editors' awards] as 'ACE AWARDS.' Editors' awards are presented at a large formal dinner, attended by people in the entertainment industry, and the ceremonies are well covered by the trade papers, such as *Hollywood Reporter* and *Variety.*"). Here such evidence was lacking.

Whether adequate proof was in fact available but simply was not gathered and proffered by PacTel is not a subject on which we can, should or do speculate. Rather, we must take the record as PacTel made it. Accordingly, the decision of the Board, premised as it was on both an erroneous view of the law and a misassessment of the evidence, cannot stand.

### CONCLUSION

Because the Board erred in concluding that PacTel presented sufficient evidence to ground its claim of analogous use priority under section 2(d) of the Lanham Act, we vacate the Board's decision. Because the question whether T.A.B.'s October 1989 post card mailing constitutes a valid "use in commerce" has not yet been adjudicated, *supra* note 2, we remand the case to the Board for further proceedings on that question and any others the Board may need to adjudicate.

*VACATED AND REMANDED*

*COSTS*

Each party to bear its own costs.