**Allen CHANCE, an individual d/b/a/ T.A.B. Systems, Plaintiff–Appellant,**

**v.**

**PAC–TEL TELETRAC INC., a Calif. Corp.; Teletrac Inc., a Calif. Corp.; Kenneth Weisner, an individual; Pac–Tel Teletrac, a joint venture; Interna-**tional Teletrac Systems Inc., a Corp.; Airtouch Teletrac, a Delaware Corp.; Airtouch Communications Inc., a Delaware Corp., Defendants–Appellees.**

**No. 98–55160.**

United States Court of Appeals, Ninth Circuit.

Argued and Submitted April 10, 2000

Filed March 20, 2001

See also, 77 F.3d 1372.

1152

R. Joseph Trojan, Eric J. Aagaard, Shelly Sanchez Maurer, Keyvan Davoudian, Trojan Law Offices, Beverly Hills, California, for plaintiff-appellant Allen Chance, an individual d/b/a/ T.A.B. Systems.

David Romanski, Karren M. Shorofsky, Steinhart & Falconer, San Francisco, California, for defendants-appellees Pac–Tel Teletrac Inc., a California Corporation; Kenneth Weisner, an individual; Pac–Tel Teletrac, a joint venture; International Teletrac Systems Inc., a Corporation; Airtouch Teletrac, a Delaware Corporation; and Airtouch Communications Inc., a Delaware Corporation.

David S. Elkind, Reboul, MacMurray, Hewitt, Maynard & Kristol, New York, NY, for Teletrac Inc., a California Corporation.

Before: FERNANDEZ, and WARDLAW, Circuit Judges, and WEINER,[1] Senior District Judge.

## I.

WEINER, Senior District Judge:

In this appeal, we must determine when a service mark is first used in commerce under the Lanham Act, 15 U.S.C. § 1127.

Allen Chance, d/b/a/ T.A.B. Systems ("T.A.B."), claims first use of the service mark "TeleTrak" in connection with T.A.B.'s lost and found tag service. Pac–Tel Teletrac, Inc. and related entities (collectively "Pac–Tel") claim priority of use in connection with their radio frequency based system for tracking fleet vehicles and recovering lost or stolen vehicles. The district court entered summary judgment in favor of Pac–Tel, finding that Pac–Tel's free services to the Los Angeles County Office of Education ("LACOE") in April 1990 constituted first use. We conclude that Pac–Tel's first use of the mark was even earlier than that found by the district court, and clearly pre-dated T.A.B.'s first use. Accordingly, we affirm the entry of summary judgment.

## II.

As early as 1984, Pac–Tel's predecessor in interest, North American Teletrac ("NAT") began developing a radio-frequency based system for tracking fleet vehicles and recovering lost or stolen vehicles. In 1985, NAT acquired the necessary frequency licenses from the Federal Communications Commission. In October 1988, Pac–Tel began field testing its system on school buses operated by LACOE. In June 1989, one of NAT's subsidiaries, DMI Systems, Inc., changed its name to International Teletrac Systems. Also in June 1989, DMI entered into a joint venture arrangement with Pacific Telesis and adopted the name Pac–Tel Teletrac. In July 1989, Pac–Tel began a comprehensive public relations campaign to market its new service, including distributing press releases and giving interviews to print and electronic media. It also made presentations to prospective customers. The district court found that in April 1990, Pac–Tel began making its service available on a commercial basis, and began making its service available to non-fleet customers in

---

1. Honorable Charles R. Weiner, Senior United States District Judge for the Eastern District of Pennsylvania, sitting by designation.

the last quarter of 1990. April 1990 was the first time LACOE began using the system on a non-test basis, although it did not begin paying for the service until December 1990, when the system was publicly launched. The record before the district court also included information that, from mid–1990 onward, Pac–Tel was developing customers among various vehicle fleet operating enterprises and had agreements with at least twenty four of them.

Meanwhile, in mid–1989, Allen Chance came up with the idea for a lost and found service using attachable tags with unique serial numbers. Finders of lost tagged items would use a toll free telephone number to report their discovery. In June 1989, Chance worked with his partner Bill Gray to design and manufacture the tags. The two brought in another friend, Tom Nettles, to work with them, coining the name "TeleTrak" for their service. "T.A.B." is an abbreviation for Tom Allen Bill.

In late summer 1989, T.A.B. obtained a toll free number under the name "Tele-Trak Lost and Found Hotline." It also obtained a mail drop and drew up a business plan. In October 1989, an unrelated company, Locksmith Ledger, included T.A.B.'s postcard in its own bulk mailing to 35,000 locksmiths. This post card announced the TeleTrak World Wide Toll Free Lost and Found Hotline. T.A.B. received 128 responses from the mailing, but made no sales as a result.

In January 1991, Chance saw advertisements for Pac–Tel's Teletrac service. He conducted a trademark search and discovered no pending application on file with the United States Patent and Trademark Office (PTO). T.A.B. filed a service mark application for "Teletrak Lost and Found Hotline" and a trademark application for "TeleTrak" claiming first use of the mark on December 28, 1990. It later claimed first use in October 1989, the time of the postcard mailer.

In February 1990, Chance purportedly sold a TeleTrak tag to Brian Voorheis, a long time friend. Chance produced a one page typewritten registration form he prepared for Voorheis' tag, number 11229, dated February 23, 1990. Chance could not state, however, how much Voorheis paid for the tag, how he paid for the tag, nor does T.A.B. have any record reflecting payment. Voorheis could not recall when he received it, when he paid for it, or how much he paid for it. He also could not recall signing up for the service or ever renewing it. The tag Voorheis produced at his deposition was one number different from the number recorded on the registration form. In addition, Kirk Rudy, another friend of Chance, testified that Chance gave him two tags in the summer of 1990. He could not recall if they were a gift or he bartered for them. T.A.B. produced no record of a sale to Rudy.

In 1992, Pac–Tel challenged the registrations filed by T.A.B. In a decision dated August 29, 1994, the Trademark Trial and Appeal Board (TTAB) sustained Pac–Tel's challenge, granting summary judgment on the ground that Pac–Tel's promotional activities prior to October 1989 were sufficient to establish that Pac–Tel used the designation in a manner analogous to service mark use prior to T.A.B.'s earliest claimed priority date. *Pactel Teletrac v. T.A.B. Systems*, 32 U.S.P.Q.2d 1668 (TTAB 1994). Because it found Pac–Tel's use pre-dated T.A.B.'s earliest claimed date, it made no finding whether the postcard mailer constituted a valid first use in commerce for T.A.B.

The entry of summary judgment was overturned on appeal by the Federal Circuit. *T.A.B. Sys. v. PacTel Teletrac*, 77 F.3d 1372 (Fed.Cir.1996). The court found that Pac–Tel's evidence of analogous use was legally insufficient to support the TTAB's conclusion that Pac–Tel was entitled to a June 1989 priority date, since the evidence of Pac–Tel's press releases did not demonstrate a substantial impact on the purchasing public. *Id.* It remanded the case to the Board for further proceedings on whether the postcard mailer constituted a valid use in commerce. *Id.* at 1378. However, following remand, T.A.B. moved to suspend the TTAB proceeding

and filed this action to pursue its claims for money damages.

## III.

■ The district court's grant of summary judgment is reviewed de novo. *Robi v. Reed,* 173 F.3d 736, 739 (9th Cir.1999). Our review is governed by the same standard used by the district court under Fed. R.Civ.P. 56(c). *Adcock v. Chrysler Corp.,* 166 F.3d 1290, 1292 (9th Cir.1999). We must determine, viewing the evidence in the light most favorable to the nonmoving party, whether there are any genuine issues of material fact and whether the district court correctly applied the relevant substantive law. *Berry v. Valence Tech., Inc.,* 175 F.3d 699, 703 (9th Cir.1999).

## IV.

Like the Court of Appeals for the Federal Circuit in the prior appeal of the registration case, the primary issue we deal with here is one of priority of use. To have prevented entry of summary judgment in the district court, Chance would have had to come forward with some evidence beyond the mere pleadings to demonstrate a disputed issue of fact that T.A.B.'s use of the TeleTrak service mark predated Pac–Tel's first use. This question is dependent upon several subordinate questions: (1) was T.A.B.'s national post card advertising mailer in 1989 a bona fide first use; (2) if not, were T.A.B.'s "sales" of tags to Voorheis and Rudy, in February and the summer of 1990 respectively, sufficient to establish first use; and (3) was the district court correct in holding that Pac–Tel's first use occurred in April 1990 when LACOE began using Pac–Tel's system on a non-test basis?

**2.** The statutory section now reads:

The term "use in commerce" means the bona fide use of a mark in the ordinary course of trade, and not made merely to reserve a right in a mark. For purposes of this chapter, a mark shall be deemed to be in use in commerce—
(1) on goods when—
(A) it is placed in any manner on the goods or their containers or the displays associated therewith or on the tags or labels affixed

### a. The definitions of "service mark" and "use in commerce"

■ Under the Lanham Act, a service mark can be any "word, name, symbol, device or any combination thereof—(1) used by a person, or (2) which a person has a bona fide intention to use in commerce and applies to register ... to identify and distinguish the services of one person, including a unique service, from the services of others and to indicate the source of the services, even if that source is unknown." 15 U.S.C. § 1127. This definition is virtually identical to the definition of "trademark," contained in the preceding paragraph of § 1127, the only difference between a trademark and a service mark is that a trademark identifies goods while a service mark identifies services. *West & Co., Inc. v. Arica Inst., Inc.,* 557 F.2d 338, 340 n. 1 (2d Cir.1977); *Caesars World, Inc. v. Caesar's Palace,* 490 F.Supp. 818, 822 (D.N.J.1980). Service marks and trademarks are governed by identical standards, *West & Co., Inc.,* 557 F.2d at 340, n. 1, and thus like with trademarks, common law rights are acquired in a service mark by adopting and using the mark in connection with services rendered. *Hanover Star Milling Co. v. Metcalf,* 240 U.S. 403, 36 S.Ct. 357, 60 L.Ed. 713 (1916).

■ The current version of § 1127 was enacted in 1988 when Congress passed the Trademark Law Revision Act (TLRA), Pub.L. No. 100–667, 102 Stat. 3935 (1988). Congress amended the Lanham Act by redefining the term "use in commerce" to mean "the bona fide use of a mark in the ordinary course of trade, and not made merely to reserve a mark." [2] The TTAB

thereto, or if the nature of the goods makes such placement impracticable, then on documents associated with the goods or their sale, and
(B) the goods are sold or transported in commerce, and
(2) on services when it is used or displayed in the sale or advertising of services and the services are rendered in commerce, or the services are rendered in more than one State or in the United States and a foreign

has held that the purpose of this revision was to eliminate "token use" as a basis for registration, and that the stricter standard contemplates instead "commercial use of the type common to the particular industry in question." *Paramount Pictures Corp. v. White,* 31 U.S.P.Q.2d 1768, 1774 (TTAB 1994). "Prior to 1989, in order to qualify for federal registration, the extent of actual use of the mark was irrelevant so long as it amounted to more than a mere sham attempt to conform with statutory requirements. However, effective November 16, 1989, Congress changed the statutory definition of 'use' so as to require a greater degree of activity." 2 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition,* § 16:8 (4th ed.1997) (footnotes omitted). The revised section now requires a showing that the applicant has a bona fide intention to use the mark in commerce. This new bona fide intention requirement has been termed entirely consistent with the traditional rules governing common law ownership of trademarks. *Allard Enters., Inc. v. Advanced Programming Resources, Inc.,* 146 F.3d 350, 357 (6th Cir.1998).

The Federal Circuit has held that "use in commerce," in the context of a trademark, means "a bona fide sale or transportation in commerce which may lawfully be regulated by Congress.... This requirement breaks down into two distinct elements: (1) Was the transaction upon which the registration application was founded bona fide; and (2) if it was bona fide, was it followed by activities proving a continuous effort or intent to use the mark." *Avakoff v. S. Pac. Co.,* 765 F.2d 1097, 10998 (Fed.Cir.1985) (citing 1 J. McCarthy § 19:37[C] (internal quotation and citations omitted)). Alternatively, the Federal Circuit has also held that where a mark has been placed on goods, a single sale or shipment may be sufficient to support an application to register the mark, providing that this shipment or sale has

the color of a bona fide transaction and is accompanied or followed by activities which would tend to indicate a continuing effort or intent to continue such use and place the product on the market on a commercial scale within a time demonstrated to be reasonable in the particular trade. *Hydro–Dynamics, Inc. v. George Putnam & Co.,* 811 F.2d 1470, 1472–74 (Fed.Cir.1987) (common law and Lanham Act require that ownership be accorded to first bona fide user; the right to register a mark flows from and follows its adoption and use in trade); *see also Signature Guardian Sys., Inc. v. Lee,* 209 U.S.P.Q. 81, 86 (TTAB 1980) and TTAB cases cited therein. However, because token use is not enough, "[m]ere adoption of a mark without bona fide use, in an attempt to reserve it for the future, does not create trademark rights.... [O]wnership of a mark requires both appropriation and use in trade; and []ownership of a mark and the exclusive right to a mark belongs to the one who first uses the mark on goods placed on the market." *Signature Guardian,* 209 U.S.P.Q. at 87, citing *United Drug Co. v. Theodore Rectanus Co.,* 248 U.S. 90, 39 S.Ct. 48, 63 L.Ed. 141 (1918).

In the service mark context, the Federal Circuit has held that

A service mark is different from a mark for goods, especially in the manner it is used in commerce. The legally significant use giving rise to rights in a mark for goods is derived from the placing of the mark in some manner on the goods either directly or on their containers or packaging. A service mark, on the other hand, entails use in conjunction with the offering and providing of a service. This makes all the more important the use of the mark in "sales" or "advertising" materials of different descriptions. *Lloyd's Food Prods., Inc. v. Eli's, Inc.,* 987 F.2d 766, 768 (Fed.Cir.1993) (citations omitted). Such use in advertising, the

country and the person rendering the services is engaged in commerce in connection with the services.

15 U.S.C. § 1127.

court held, can include "listing the name of the business, including the mark, in telephone directories and placing listings and advertisements in the yellow pages." *Id.* Later, in *West Florida Seafood, Inc. v. Jet Restaurants, Inc.,* 31 F.3d 1122 (Fed.Cir. 1994), the Federal Circuit emphasized that, in reviewing evidence of "use in commerce" in a service mark case, "one should look at the evidence as a whole, as if each piece of evidence were part of a puzzle which, when fitted together establishes prior use." *Id.* at 1125–26. Based on its prior decision in *Lloyd's*—that advertisements may constitute acceptable "specimens" of use—the Federal Circuit in *West Florida* determined that three newspaper advertisements corroborated the plaintiff's prior use assertions when combined with other evidence of state trade name registrations, three regulatory licenses and a state health inspection report listing the service mark. *Id.* at 1126. Significantly, there is nothing in the *West Florida* opinion to indicate whether there were actual sales of services using the service mark in the same time frame of the appearance of the advertising.

Our own cases are not dissimilar. In *New West Corp. v. NYM Co. of Calif., Inc.,* 595 F.2d 1194 (9th Cir.1979), a pre-TLRA trademark case, we determined that, although mere advertising by itself may not establish priority of use, advertising combined with other non-sales activity is sufficient to establish use in commerce. Specifically, we held that in deciding a question of first use, a court should examine the totality of the parties' activities, *Id.* at 1200, a formulation not dissimilar to the Federal Circuit's "jigsaw puzzle" analogy. Quoting *New England Duplicating Co. v. Mendes,* 190 F.2d 415 (1st Cir.1951), we stated

> It seems to us that although evidence of sales is highly persuasive, the question of use adequate to establish appropriation remains one to be decided on the facts of each case, and that evidence

showing, first, adoption, and second, use in a way sufficiently public to identify or distinguish the marked goods in an appropriate segment of the public mind as those of the adopter of the mark is competent to establish ownership, even without evidence of actual sales.

*New West,* 595 F.2d at 1200. We went on to cite *Hotel Corp. of Am. v. Inn Am., Inc.,* 153 U.S.P.Q. 574 (TTAB 1967) for the proposition that

> a party may acquire rights in a designation which may be superior to any rights that a subsequent user may acquire in a confusingly similar term through use thereof in advertising or promotional material connected with the publicizing and/or offering for sale of goods or services, providing that this use has been of such nature and extent as to create an association of the goods or services and the mark with the user thereof.

*New West,* 595 F.2d at 1200. We concluded that the totality of the appellee's acts, prior to its first sale,[3] was sufficient to show adoption of its mark and "use in a way sufficiently public to identify or distinguish the marked goods in an appropriate segment of the public mind. . . . Although mere advertising by itself may not establish priority of use . . . the totality of appellee's prior actions, taken together, establish a right to use the trade-mark. . . ." *Id.*

Most recently, in *Brookfield Communications, Inc. v. West Coast Entm't Corp.,* 174 F.3d 1036 (9th Cir.1999), a case involving internet domain names, we rejected the theory that e-mail correspondence predating actual sales could constitute use in commerce because it failed to establish use "in a way sufficiently public to identify or distinguish the marked goods in an appropriate segment of the public mind as those of the adopter of the mark." *Id.* at 1052 (quoting *New West,* 595 F.2d at 1200.) We made clear that "trademark rights are not conveyed through mere intent to use a

---

**3.** New West had sent 430,000 individuals a free exemplar copy of its magazine containing its mark and began receiving paying orders

within three days. *Id.* at 1196–97. Over 13,500 people bought subscriptions prior to the printing of the first issue. *Id.* at 1200.

mark commercially." *Id.*, (*citing Allard Enters. v. Advanced Programming Resources, Inc.*, 146 F.3d 350, 356 (6th Cir. 1998); *Zazu Designs v. L'Oreal, S.A.*, 979 F.2d 499, 504 (7th Cir.1992)). However, "trademark rights can vest even before any goods or services are actually sold if 'the totality of [one's] prior actions, taken together, [can] establish a right to use the· trademark.'" *Brookfield*, 174 F.3d at 1052 (*quoting New West*, 595 F.2d at 1200).

■ We find that the totality of the circumstances test should apply to service mark cases as well. The statutory language supports the conclusion that "use in commerce" should be similarly defined for service marks as it is for trade marks. For both goods and services, the "use in commerce" requirement includes (1) an element of actual use, and (2) an element of display. *Compare* § 1127's definition of "use in commerce" for goods—"a mark shall be deemed to be in use in commerce—... on goods when—it is placed in any manner on the goods ... the goods are sold ..."—with that section's definition of "use in commerce" for services: "on services when it is used or displayed ... and the services are rendered ...". In addition, for each type of mark, the TLRA amended the definition of use in commerce to eliminate sham uses to reserve a right in a mark. The propriety of applying *New West*'s totality approach is further supported by the fact that *New West* based its formulation on at least one service mark case. *See New West*, 595 F.2d at 1200 (citing *Hotel Corp. of Am.*, 153 U.S.P.Q. at 576).

Although perhaps more flexible than the approaches taken by other courts, the totality of the circumstances approach is consistent with various notable decisions discussing the "use of commerce" requirement of § 1127. *See e.g., La Societe Anonyme des Parfums Le Galion v. Jean Patou, Inc.*, 495 F.2d 1265, 1274 n. 11 (2d Cir.1974) ("[T]he balance of the equities plays an important role in deciding whether defendant's use is sufficient to warrant trademark protection."); *New England*

*Duplicating Co. v. Mendes*, 190 F.2d 415, 418 (1st. Cir.1951) ("It seems to us that although evidence of sales is highly persuasive, the question of use adequate to establish appropriation remains one to be decided on the facts of each case, and that evidence showing, first, adoption, and, second, use in a way sufficiently public to identify or distinguish the marked goods in an appropriate segment of the public mind as those of the adopter of the mark, is competent to establish ownership, even without evidence of actual sales."); *Hotel Corp. of Am.*, 153 U.S.P.Q. at 576 ("A party may acquire rights in a designation ... through prior use thereof in advertising or promotional material connected with the publicizing and/or offering for sale of goods or services providing that this use has been of such nature and extent as to create an association of the goods or services and the mark with the user thereof.").

Accordingly, we hold that the totality of the circumstances must be employed to determine whether a service mark has been adequately used in commerce so as to gain the protection of the Lanham Act. In applying this approach, the district courts should be guided in their consideration of non-sales activities by factors we have discussed, such as the genuineness and commercial character of the activity, the determination of whether the mark was sufficiently public to identify or distinguish the marked service in an appropriate segment of the public mind as those of the holder of the mark, the scope of the non-sales activity relative to what would be a commercially reasonable attempt to market the service, the degree of ongoing activity of the holder to conduct the business using the mark, the amount of business transacted, and other similar factors which might distinguish whether a service has actually been "rendered in commerce".

b. Application

■ Reviewing the totality of the circumstances presented in the record before the district court on summary judgment, and permitting all inferences to be viewed

in T.A.B.'s favor, we cannot say that T.A.B.'s use of the TeleTrak mark was a "sham" designed merely to warehouse the mark. All inferences from the record indicate that when he came up with the idea for the lost and found tag service, Chance intended to commercially exploit the idea using the TeleTrak mark. That is not the end of the inquiry, however.

We find T.A.B.'s mailing of the 35,000 post cards, which generated 128 responses to its 800 number and no sales, cannot be considered a first use under the law set out above.[4] While the mailing may have been some evidence of a commercial intent when it was mailed, Chance failed to come forward with sufficient evidence to establish a triable issue of fact that T.A.B. genuinely continued to exploit the mark thereafter. The district court found the Voorheis and Rudy "sales" constituted token sales and were not a bona fide first use. The record on summary judgment amply supports this conclusion. There was no evidence presented that either Voorheis or Rudy paid for the tag or the service. Chance could not state how much Voorheis paid for the tag or how he paid for the tag. T.A.B. could produce no record reflecting payment. Voorheis could not recall when he received it, when he paid for it, or how much he paid for it. He could not even recall if he ever signed up for the service. Rudy testified that Chance *gave* him two tags in the summer of 1990 and could not recall if they were a gift or he bartered for them. T.A.B. produced no record of a sale to Rudy.

While Chance testified in his deposition that T.A.B. had a "list of subscribers", he did not produce records from his toll free service to substantiate customers from 1990 forward. He also could not identify any other sales of T.A.B.'s products in 1990 other than the Voorheis sale. In addition, the record indicated that the software to process customer calls to the toll free number was never delivered, and T.A.B. never leased the necessary computer hardware to actually operate the business. Through early 1991, T.A.B. had no working capital and no marketing plan and it ordered no tags from its supplier until February 1991.

Pac–Tel, in contrast, had significant activities even prior to T.A.B.'s post card mailing. The record demonstrates that as early as June 1989, Pac–Tel began using the mark on a continuous basis. As early as 1984, a Pac–Tel predecessor company was using the mark as part of its business name. Pac–Tel began a public relations campaign using the mark to introduce its new service in July 1989. In September 1989, it sent out brochures to potential customers. In early fall 1989, it conducted interviews with major newspapers including the *Wall Street Journal, Washington Post* and *Chicago Tribune* which resulted in a number of stories that mentioned the service mark. During this time the service was marketed to potential customers who managed large vehicle fleets through a slide presentation using the mark. While the district court found that Pac–Tel's first use was in April 1990, when it began making its service available on a commercial basis for the first time on the Los Angeles school buses, the totality of the record demonstrates that its first use of the mark was significantly earlier and clearly predated T.A.B.'s first use.[5]

---

4. Under *New West* and *Brookfield*, the scope of the advertising activity is central to its weight in the totality of the circumstances assessment. The scope of T.A.B.'s mailing pales in comparison to the type of advertising—430,000 solicitations, which generated 13,500 subscription sales—that we found determinative in *New West*. In addition, it is questionable whether this mailing was a commercially reasonable attempt to market the service. The mailing was addressed to locksmiths; there was no evidence that locksmiths were intended to be the users of the lost and found tags.

5. We find no merit to T.A.B.'s argument that the district court ignored the Federal Circuit's holding in the registration case when it entered summary judgment for Pac–Tel. In deciding that the TTAB's findings on analogous use were unsupported by the evidence, the Federal Circuit declined to address the question of whether Pac–Tel had used Teletrac as a trade name prior to October 1989. 77 F.3d

### V.

 Finally, we also find no merit in T.A.B.'s argument that the district court improperly cut off discovery.[6] T.A.B. asserts that, in its witness list submitted after the close of discovery, Pac–Tel listed six witnesses not previously identified. This witness list was filed of record May 19, 1997. On December 11, 1997, the parties filed a joint stipulation regarding their dispute over conducting depositions of these witnesses. T.A.B. never filed a motion pursuant to Fed.R.Civ.P. 56(f) to postpone decision on the summary judgment motion to permit additional discovery. T.A.B. complains that the district court entered summary judgment on December 23, 1997, without first ruling on the deposition dispute. It argues that the district court deprived it of the opportunity to discover additional crucial evidence which would have assisted it in convincing the district court that disputed facts existed precluding summary judgment. T.A.B. makes no attempt to identify what this evidence might be.

 T.A.B.'s argument suffers several flaws. Foremost, it never actually filed a Rule 56(f) motion to delay consideration of the pending summary judgment motion. It also did not proffer to the district court—or make a showing here on appeal—sufficient facts to show that evidence which it sought existed and would prevent summary judgment. It merely states in conclusory form that it was deprived of the opportunity to discover additional crucial evidence without ever identifying the content of that evidence. In addition, the record shows T.A.B. learned of the additional witnesses no later than May 19, 1997, seven months prior to the district court's entry of summary judgment. T.A.B. makes no argument why it could not have taken the additional discovery within that period. Given that T.A.B. failed diligently to pursue discovery, and makes no showing that evidence actually exists which would change the result below, we see no abuse of discretion in the district court's failure to grant additional time to conduct discovery.

AFFIRMED.

---

at 1374, n. 2. Rather, it remanded the matter for consideration of whether T.A.B.'s postcard mailing constituted first use and "any other [question] the Board may need to adjudicate." *Id.* at 1378.

Clearly, vacatur of the entry of summary judgment, with direction on remand to take further evidence, does not bar the party who originally prevailed on the summary judgment motion from offering such evidence to further support its contentions. Pac–Tel was certainly within its bounds on remand to the TTAB—and before the district court after T.A.B. abandoned the registration action and instituted the infringement action—to put on further evidence of its use of its trade name to support analogous use. Since the district court decided the case based on first use and not analogous use, we find the argument is at best irrelevant.

**6.** We review for abuse of discretion a district court's refusal to permit further discovery before ruling on a summary judgment motion. *Mackey v. Pioneer Nat'l Bank*, 867 F.2d 520, 523 (9th Cir.1989). The district court's decision not to permit additional discovery pursuant to Rule 56(f) is also reviewed for abuse of discretion. *Nidds v. Schindler Elevator Corp.*, 113 F.3d 912, 920 (9th Cir. 1996). The burden is on the party seeking additional discovery to proffer sufficient facts to show that the evidence sought exists, and that it would prevent summary judgment. *Id.* "Moreover, the district court does not abuse its discretion by denying further discovery if the movant has failed diligently to pursue discovery in the past." *Id.* (citing *Conkle v. Jeong*, 73 F.3d 909, 914 (9th Cir. 1995)). Stated another way, "[w]e will only find that the district court abused its discretion if the movant diligently pursued its previous discovery opportunities, and if the movant can show how allowing additional discovery would have precluded summary judgment." *Byrd v. Guess*, 137 F.3d 1126, 1131 (9th Cir.1998).