**THIS OPINION IS A PRECEDENT OF THE TTAB**

Hearing:
November 15, 2007

Mailed:
April 4, 2008

**UNITED STATES PATENT AND TRADEMARK OFFICE**

———

**Trademark Trial and Appeal Board**

———

Bass Pro Trademarks, L.L.C.
v.
Sportsman's Warehouse, Inc.

———

Cancellation No. 92045000

———

Garrett M. Weber of Lindquist & Vennum PLLP for Bass Pro Trademarks, L.L.C.

David A. Allgeyer of Husch & Eppenberger, LLC for Sportsman's Warehouse.

———

Before Walters, Bergsman and Wellington, Administrative Trademark Judges.

Opinion by Bergsman, Administrative Trademark Judge:

Bass Pro Trademarks, L.L.C. (hereinafter "petitioner") filed a petition to cancel Registration No. 2390988, owned by Sportsman's Warehouse, Inc. (hereinafter "respondent"), for the mark SPORTSMAN'S WAREHOUSE and design, shown below,



for "retail and wholesale stores featuring hunting supplies, fishing supplies, camping supplies, reloading supplies,

outerwear clothing and footwear."[1]  During the prosecution of respondent's application for registration, the examining attorney required respondent to disclaim the exclusive right to use the words "Sportsman's Warehouse" and "Hunting · Fishing · Camping · Reloading · Outerwear · Footwear" because the wording is merely descriptive for "retail and wholesale stores [that] are presumed to be *warehouse style* featuring goods for the sportsman."[2]  In its February 7, 2000 response, respondent disclaimed those words.

As grounds for cancellation, petitioner has alleged priority of use and likelihood of confusion and fraud.[3] With respect to likelihood of confusion, petitioner has claimed ownership and prior use of the mark SPORTSMAN'S WAREHOUSE, based on common law rights, and the registered mark BASS PRO SHOPS SPORTSMAN'S WAREHOUSE, shown below,

---

[1] Registration No. 2390988; issued October 3, 2000, based on an application filed January 22, 1999; Section 8 affidavit accepted. Respondent filed its declaration of continued use in accordance with the provisions of Section 8 of the Trademark Act of 1946, 15 U.S.C. §1058, on August 24, 2006, after the petition for cancellation was filed (September 30, 2005).
[2] August 6, 1999 Office Action.
[3] Petitioner also alleged that respondent has misused the federal registration symbol ®.  Although there was testimony regarding the use of the federal registration symbol, because petitioner presented no argument in its brief on this claim, we give it no further consideration. *See Time Warner Entertainment Co. v. Jones,* 65 USPQ2d 1650, 1653, n. 3 (TTAB 2002); *Viacom International Inc. v. Komm,* 46 USPQ2d 1233, 1235 n.3 (TTAB 1998).



for "retail stores featuring clothing, fishing supplies and sporting goods,"[4] and has alleged that respondent's mark, when used in connection with retail and wholesale stores, so resembles petitioner's marks, when used in connection with retail stores, as to be likely to cause confusion. With respect to its fraud claim, petitioner has alleged that respondent never used its mark in connection with wholesale store services and that respondent knowingly sought registration for wholesale store services "with the intent to induce" the Patent and Trademark Office to grant the registration. Respondent denied the salient allegations in petitioner's amended petition for cancellation and pleaded, *inter alia,* the following affirmative defenses:

1. Laches;

2. Respondent has prior rights in the mark SPORTSMAN'S WAREHOUSE; and,

---

[4] Registration No. 2071417 for the mark BASS PRO SHOPS SPORTSMAN'S WAREHOUSE and design, issued June 17, 1997, based on an application filed March 1, 1996; affidavits under Sections 8 and 15 accepted and acknowledged. Petitioner disclaimed the exclusive right to use "Sportsman's Warehouse."

3. Petitioner does not have any rights in the term SPORTSMAN'S WAREHOUSE because petitioner disclaimed the exclusive right to use "Sportsman's Warehouse."

When respondent filed its Section 8 declaration during the pendency of this proceeding, it deleted "wholesale" stores from the description of services without the consent of petitioner or approval of the Board. *See* Trademark Rule 2.133(a), 27 CFR §2.133(a) (a registration subject to a cancellation proceeding may not be amended without the consent of the other party or upon a motion granted by the Board). We construe respondent's deletion of "wholesale" stores from the description of services as an unconsented motion, and, in our discretion, we grant the motion to amend the registration. However, this does not remove the fraud claim from this proceeding. *Medinol Ltd. v. Neuro Vasx, Inc.,* 67 USPQ2d 1205, 1208 (TTAB 2003).

## The Record

By operation of Trademark Rule 2.122, 37 CFR §2.122, the record includes the pleadings and the registration file for respondent's mark. The record also includes the following testimony and evidence:

A. Petitioner's Evidence.

1. Notice of reliance on respondent's answers to Interrogatory Nos. 3, 8, 9, and 10.

4

2.    Trial deposition transcript of Michael B. Mazis, Ph.D., regarding a likelihood of confusion survey with attached exhibits;

3.    Notice of reliance on excerpts from discovery depositions of the following persons:

       a.    William Bome, respondent's fishing manager in Aurora, Colorado;

       b.    Joel Michael McRae, respondent's store manager in Littleton, Colorado;

       c.    Jason Perez, respondent's store manager in Thornton, Colorado;

       d.    Dale R. Smith, respondent's President, with attached exhibits;

       e.    Stuart Utgaard, respondent's Chairman and CEO, with attached exhibits;

       f.    Jamison Bryan Hensley, petitioner's assistant store manager at the BASS PRO SHOPS SPORTSMAN'S WAREHOUSE in Memphis, Tennessee;[5]

       g.    James Osborne, an employee of petitioner;

---

[5] Trademark Rule 2.120(j)(3) provides that "[t]he discovery deposition of a party or of anyone who at the time of taking the deposition was an officer, director or managing agent of a party, or a person designated by a party pursuant to Rule 30(b)(6) or Rule 31(a) of the Federal Rules of Civil Procedure, may be offered in evidence by an adverse party."  While it is not clear whether the witness would fall within one of the preceding categories, petitioner indicates in its notice of reliance that the parties have stipulated to the designation of discovery depositions as trial testimony.

h. Paul Otte, an employee at respondent's SPORTSMAN'S WAREHOUSE store in Memphis, Tennessee;

i. James A. Hagale, petitioner's President and COO;

j. Ken Burroughs, an employee of petitioner; and,

k. Bruce Little, the attorney who filed and prosecuted the application for the registration at issue, with attached exhibits.

4. Testimony deposition of Stan Lippelman, petitioner's Vice President of Marketing, with attached exhibits;

5. Testimony deposition of Haden Holley, the General Manager of the BASS PRO SHOPS SPORTSMAN'S WAREHOUSE store in Memphis, Tennessee, with attached exhibits; and,

6. Testimony deposition of Marie Antoinette Miller, petitioner's Vice President and CFO, with attached exhibits;

B. Respondent's Evidence.

1. Notice of reliance on the following items:

    a.    Respondent's Answers to Petitioner's First Set of Interrogatories and Requests for Production of Documents;[6]

    b.    Respondent's Amended Answer to Petitioner's Interrogatory No. 8;

    c.    Respondent's Responses to Petitioner's First Set of Requests for Admission and Second Set of Interrogatories and Requests for Production of Documents;

    d.    Petitioner's Responses to Respondent's First Set of Interrogatories and Requests for Production of Documents;

    e.    Petitioner's Responses to Respondent's Second Set of Interrogatories and Requests for Production of Documents;

    f.    Petitioner's Responses to Respondent's Third Set of Interrogatories and Requests for Production of Documents; and,

---

[6] Trademark Rule 2.123(j)(5) provides that "an answer to an interrogatory, or an admission to a request for admission, may be submitted and made part of the record only by the receiving or inquiring party." However, because the parties stipulated to the use of discovery depositions as evidence, because petitioner did not object to respondent's reliance on respondent's answers to petitioner's written discovery, and because the discovery responses were used as exhibits during depositions, we consider the responses as having been properly made of record. TBMP §704.10 (2nd ed. rev. 2004). Respondent's responses to petitioner's document requests were incorporated as part of its responses to the interrogatories and, therefore the responses were verified under oath, however, no documents were included in the notice of reliance.

g. The file history for petitioner's pleaded registration;

2. The entire discovery deposition of Dale R. Smith, with attached exhibits;

3. The entire discovery deposition of Scott Nielsen, a former owner of respondent's predecessor, and the owner of Pacific Flyways;

4. The entire discovery deposition of Stuart Utgaard, with attached exhibits;

5. Excerpts from the discovery deposition of Jamison Bryan Hensley;

6. The entire discovery deposition of Jim Hagale, with attached exhibits;

7. The entire discovery deposition of Marie Antoinette Miller, with attached exhibits;

8. The entire discovery deposition of John David Hagel, petitioner's Operations Manager for the BASS PRO SHOPS SPORTSMAN'S WAREHOUSE store in Memphis, Tennessee;

9. The entire discovery deposition of April Henderson, petitioner's Promotions Manager for the BASS PRO SHOPS SPORTSMAN'S WAREHOUSE store in Memphis, Tennessee;

10. Excerpts from the discovery deposition of Haden Holley;

11. The entire discovery deposition of Stan Lippelman, with one exhibit;[7]

12. Excerpts from the discovery deposition of Mark Winkelman regarding a survey for whether the mark SPORTSMAN'S WAREHOUSE has acquired distinctiveness, with attached exhibits;

13. The discovery deposition of Gary T. Ford regarding his expert report rebutting the conclusions and methodology used by Mark Winkelman in his acquired distinctiveness survey, with attached exhibits;[8]

14. Excerpts from the discovery deposition of Michael B. Mazis regarding his likelihood of confusion survey;

15. The testimony deposition of Dale R. Smith, with attached exhibits; and,

16. The testimony deposition of Stuart Utgaard, with attached exhibits.

We note that respondent has extensively and unnecessarily designated testimony and evidence as confidential. For example, "Respondent's Confidential Notice of Reliance" (No. 1 *supra*) includes petitioner's application file for its BASS PRO SHOPS SPORTSMAN'S WAREHOUSE and design registration (Registration No.

---

[7] Petitioner also submitted excerpts from this discovery deposition as part of its rebuttal testimony.
[8] Petitioner also submitted this discovery deposition as part of its rebuttal testimony.

2071417), as well as respondent's application file to register SPORTSMAN'S WAREHOUSE and design. Respondent is advised that we will consider only information that is truly confidential as confidential (*e.g.,* sale expenditures, revenues, trade secrets, etc.).[9] In the event that respondent's counsel appears before us in another proceeding, we urge counsel to exercise discretion and designate as confidential only such information that is truly confidential.

Also, we note that both parties attached exhibits to their briefs. "Exhibits and other evidentiary materials attached to a party's brief on the case can be given no consideration unless they were properly made of record during the time for taking testimony." TBMP §704.05(b) (2nd ed. rev. 2004) and the cases cited therein. Accordingly, we have given the exhibits attached to the briefs no consideration.

### Standing

A party has standing to cancel a registration under Section 14 of the Trademark Act of 1946 if that party can demonstrate that it has a real interest in the proceeding (*i.e.,* a direct and personal stake in the outcome of the proceeding). *Ritchie v. Simpson,* 170 F.3d 1092, 50 USPQ2d

---

[9] In the confidential Stuart Utgaard testimony deposition, respondent's counsel stated that the testimony regarding dollar amounts was confidential. (Utgaard Testimony Dep., p. 20).

1023, 1025-1026 (Fed. Cir. 1999); *Lipton Industries, Inc. v. Ralston Purina Co.,* 670 F.2d 1024, 213 USPQ 185, 189 (CCPA 1982). Petitioner attached to the original petition for cancellation two certified copies of its pleaded registration showing the current status of the registration and title in the petitioner. Because petitioner has properly made its pleaded registration of record, petitioner has established its standing to cancel the respondent's registration. *Cunningham v. Laser Golf Corp.,* 222 F.3d 943, 55 USPQ2d 1842, 1844 (Fed. Cir. 2000); *Lipton Industries, Inc. v. Ralston Purina Co.,* 213 USPQ 185 at 189.

Chronology of the Parties' Use

The following table sets forth the timeline of relevant facts established in this record.

| Date | Event |
|------|-------|
|  |  |
| 1986–1995 | Respondent was doing business in Midvale, Utah under the name SPORTS WAREHOUSE.[10] |
|  |  |
| 1991-1994 | Respondent's customers inquired why the store was called SPORTS WAREHOUSE because respondent does not sell all types of sporting goods. Customers suggested that respondent change its name to SPORTSMAN'S WAREHOUSE to reflect its products. Respondent's principals and officers discussed name change.[11] |

---

[10] Scott Neilson Dep., p. 4; Respondent's Response To Interrogatory No. 4.
[11] Dale Smith Discovery Dep., pp. 19-21; Respondent's Response to Interrogatory No. 4.

| Date | Event |
|------|-------|
| | |
| Early 1995 | Petitioner advertised the opening of the BASS PRO SHOPS SPORTSMAN'S WAREHOUSE store in Lawrenceville, Georgia (outside Atlanta) in its 1995 Master Catalog.[12] |
| | |
| February 1, 1995 | Respondent filed for "Business Name Registration/or DBA Application" requesting the business name "Sportsman's Warehouse."[13] |
| | |
| February/March, 1995 | Respondent changed the exterior sign on its store to SPORTSMAN'S WAREHOUSE from SPORTS WAREHOUSE.[14] |
| | |
| March 1, 1995 | Petitioner opened the BASS PRO SHOPS SPORTSMAN'S WAREHOUSE in Lawrenceville, Georgia.[15] |
| | |
| 1997 | Respondent became aware of petitioner's use of SPORTSMAN'S WAREHOUSE.[16] |
| | |
| 1998 | Petitioner became aware of respondent's business.[17] |

[12] Miller Testimony Dep., pp. 12-13, Petitioner's Exhibit 10; Petitioner's Response to Interrogatory Nos. 20 and 21.

[13] Stuart Utgaard Discovery Dep., p. 11, Exhibit 7; Dale Smith Discovery Dep., pp. 19-21.

[14] Stuart Utgaard Discovery Dep., pp. 13, 23; Dale Smith Discovery Dep., pp. 19-21 (Spring 1995); Respondent's Response to Interrogatory No. 4.

[15] Miller Testimony Dep., pp. 11, 13; Miller Discovery Dep., p. 37; Henderson Dep., p. 14 (testified that the store opened in April 2001); Petitioner's Response to Interrogatory Nos. 20 and 21. This was the second Bass Pro Shops retail store. The first was a BASS PRO SHOPS OUTDOOR WORLD. (Miller Testimony Dep., p. 14).

[16] Stuart Utgaard Discovery Dep., pp. 14-15 (1997, 1998, or 1999); Dale Smith Discovery Dep., p. 16 (mid-90s, "probably '96, '98, somewhere in there"); Respondent's Response to Interrogatory No. 2.

[17] Petitioner's Response to Interrogatory No. 4. Specifically, petitioner stated that "Bass Pro . . . first became aware of Registrant's business generally in 1998 and states further that it first became aware of Registrant's use of the SPORTSMAN'S WAREHOUSE mark in 2002 when a search was made of all trademarks belonging to Registrant." (Petitioner's Response to Interrogatory No. 4). It stretches credulity for petitioner to claim that it became aware of respondent's business in 1998, but not of its service mark and trade name. We also note that in

| Date | Event |
|------|-------|
|  | Respondent opened a SPORTSMAN'S WAREHOUSE store in Provo, Utah.[18] |
| 1999 | Respondent opened a SPORTSMAN'S WAREHOUSE store in Riverdale, Utah.[19] |
| 2000 | Petitioner opened its second BASS PRO SHOPS SPORTSMAN'S WAREHOUSE store in Memphis, Tennessee.[20]<br><br>Respondent opened two SPORTSMAN'S WAREHOUSE stores in Idaho.[21] |
| 2001 | Petitioner opened a BASS PRO SHOPS SPORTSMAN'S WAREHOUSE store in St. Charles, Missouri (outside St. Louis), its third SPORTSMAN'S WAREHOUSE store.[22] After petitioner opened its store in St. Charles, customers came into respondent's stores seeking to redeem petitioner's gift cards.[23]<br><br>Respondent opened SPORTSMAN'S WAREHOUSE stores in Loveland and Grand Junction, Colorado and in the State of Washington.[24]<br><br>John Morris, petitioner's founder and CEO, called respondent's principal and CEO after respondent opened its store in Loveland, Colorado (May 18, 2001) to discuss the expansion plans of the companies, particularly in Colorado.[25] |

2001, the principals of the parties spoke with each other regarding the companies' plans for expansion. Accordingly, we find that petitioner had knowledge of respondent's use of SPORTSMAN'S WAREHOUSE in 1998.

[18] Dale Smith Discovery Dep., p. 29; Respondent's Response to Interrogatory No. 11.

[19] Respondent's Response to Interrogatory No. 11.

[20] Miller Discovery Dep., p. 17; Petitioner's Response to Interrogatory No. 2.

[21] Respondent's Response to Interrogatory No. 11.

[22] Miller Discovery Dep., p. 17; Petitioner's Responses to Interrogatory Nos. 7 and 9.

[23] Respondent's Response to Interrogatory No. 3.

[24] Respondent's Response to Interrogatory No. 11.

[25] Stuart Utgaard Testimony Dep., pp. 10-11, 87-88.

| Date | Event |
|------|-------|
|      |       |
| 2002 | Petitioner closed the BASS PRO SHOPS SPORTSMAN'S WAREHOUSE store in Lawrenceville, Georgia.[26]<br><br>Respondent opened SPORTSMAN'S WAREHOUSE stores in Oregon, Washington, and Minnesota.[27] |
|      |       |
| 2003 | Respondent opened SPORTSMAN WAREHOUSE stores in Montana, Oregon, Arizona, Idaho, Colorado (Thornton), and Iowa.[28] |
|      |       |
| 2004 | Respondent opened SPORTSMAN'S WAREHOUSE stores in Alaska, Washington, Texas, New Mexico, Nevada, Wisconsin, South Dakota, Arizona, and North Dakota.[29] |
|      |       |
| 2005 | Respondent opened SPORTSMAN'S WARESHOUSE stores in Oregon, Arizona, Texas, Wyoming, Oklahoma, Mississippi, Colorado (Littleton and Colorado Springs), Alaska, and Pennsylvania.[30] |
|      |       |
| June 15, 2005 | Respondent opened a SPORTSMAN'S WAREHOUSE store in Memphis, Tennessee.[31]<br><br>After respondent opened its SPORTSMAN'S WAREHOUSE store in Memphis, customers began bringing respondent's coupons and advertising materials to the BASS PRO SHOPS SPORTSMAN'S WAREHOUSE store in Memphis. Also, customers brought respondent's receipts to the BASS PRO SHOPS SPORTSMAN'S WAREHOUSE store seeking credit for their BASS PRO SHOPS reward program.[32] |

---

[26] Petitioner's Responses to Interrogatory Nos. 7 and 9; Miller Discovery Dep., pp. 16-17.
[27] Respondent's Response to Interrogatory No. 11.
[28] Respondent's Response to Interrogatory No. 11.
[29] Respondent's Response to Interrogatory No. 11.
[30] Respondent's Response to Interrogatory No. 11.
[31] Respondent's Response to Interrogatory No. 11; Otte Dep., pp. 7-8.
[32] Petitioner's Response to Interrogatory No. 15.

| Date | Event |
|------|-------|
|  |  |
| July 26, 2005 | The BASS PRO SHOPS SPORTSMAN'S WAREHOUSE store in Memphis, Tennessee changed its store sign to SPORTSMAN'S CENTER from SPORTSMAN'S WAREHOUSE.[33]  Prior to the change, a SPORTSMAN'S WAREHOUSE sign appeared on the front of the building, off to the side; however, an equally large, if not larger BASS PRO SHOPS logo was displayed over the door.[34] |
|  |  |
| 2006 | Respondent has 48 SPORTSMAN'S WAREHOUSE stores in 23 states.[35]<br><br>Petitioner has 33 BASS PRO SHOPS retail stores.[36]  There are three BASS PRO SHOPS SPORTSMAN'S WAREHOUSE stores:  one in Memphis, Tennessee, one in St. Charles, Missouri, and one in Macon, Georgia.[37] |

<u>Priority</u>

In a cancellation proceeding, petitioner does not

necessarily have priority simply because it owns a

registration.  *Brewski Beer Co. v. Brewski Brothers, Inc.,*

---

[33] Hensley, Dep., p. 20; Hagale Discovery Dep., p. 76; Hagel Dep., pp. 10-11; Henderson Dep., pp. 14-15; Holley Discovery Dep., p. 12 (he started on August 15, 2005, but testified that the sign changed shortly after he started); Petitioner's Response to Interrogatory No. 2.  The sign was changed without authorization. (Hagale Dep., p. 74; Lippelman Discovery Dep., pp. 19 and 22). However, it has not been changed back.  (Hagale Dep., p. 79; Lippelman Discovery Dep., p. 21).  Nevertheless, the advertising for the Memphis store still references SPORTSMAN'S WAREHOUSE. (Hensley Dep., pp. 23-24; Holley Testimony Dep., p. 17).  *Compare* Holley Discovery Dep., p. 17 (the "bulk" of the advertising and promotional materials features SPORTSMAN'S CENTER).
[34] Lippelman Testimony Dep., Respondent's Exhibit 1009.
[35] Dale Smith Discovery Dep., p. 30.
[36] Miller Discovery Dep.,. p. 14.
[37] Lippelman Discovery Dep., pp. 17-18; Hensley Dep. p. 15.  In October 2006, petitioner opened a third BASS PRO SHOPS SPORTSMANS' WAREHOUSE in Macon, Georgia.  (Lippelman Testimony Dep., p. 26).

47 USPQ2d 1281, 1284 (TTAB 1998) (The "Board has taken the position, in essence, that the registrations of each party offset each other; that petitioner as a plaintiff, must, in the first instance, establish prior rights in the same or similar mark … Of course, petitioner or respondent may rely on its registration for the limited purpose of proving that its mark was in use as of the application filing date").

There are two issues regarding priority in this case:

1.   Whether petitioner's acquisition of common law rights in the mark SPORTSMAN'S WAREHOUSE is prior to respondent's first use of its registered mark; and,

2.   Whether petitioner's first use of its registered mark is prior to respondent's first use of its registered mark.

Respondent has argued that SPORTSMAN'S WAREHOUSE, either alone or as part of petitioner's registered mark, is merely descriptive and, thus, is not inherently distinctive; and that petitioner has not established that SPORTSMAN'S WAREHOUSE, as used by petitioner, has acquired distinctiveness in connection with petitioner's services. Therefore, we begin our analysis by determining, first, whether SPORTSMAN'S WAREHOUSE is merely descriptive in connection with petitioner's identified services; and, if so, whether, and as of what date, petitioner has established

that it acquired distinctiveness of SPORTSMAN'S WAREHOUSE in connection with those services.

A.   Is SPORTSMAN'S WAREHOUSE merely descriptive?

Both parties disclaimed the exclusive right to use the term "Sportsman's Warehouse" in their respective registrations in response to requirements by the Examining Attorneys during the examination of their respective applications.  Under these circumstances, the disclaimer may be considered an admission by the parties that the term "Sportsman's Warehouse" is merely descriptive.  *See American Rice, inc. v. H.I.T. Corp.,* 231 USPQ 793, 798 (TTAB 1986) (statements in application may be considered evidence); *Sunbeam Corp. v. Battle Creek Equipment Co.,* 216 USPQ 1101, 1102 (TTAB 1982) (applicant's claim that its mark had acquired distinctiveness is an admission that the mark is merely descriptive); *Oxy Metal Industries Corp. v. Technic, Inc.,* 191 USPQ 50, 52-53 n. 3 (TTAB 1976); TBMP §704.04 (2nd ed. rev. 2004).

In response to respondent's argument that "Sportsman's Warehouse" is merely descriptive, petitioner argued that it "has proffered evidence of substantial advertising expenditures and sales for its 'Sportsman's Warehouse' stores, dating back to 1995, as evidence of secondary meaning."[38]  We construe petitioner's noted statement not

---

[38] Petitioner's Reply Brief, p. 19.

only as a further concession that "Sportsman's Warehouse" is merely descriptive, but also as an assertion that the term has acquired distinctiveness.

We also note that "sportsman" is defined as "one who engages in the sports of the field and esp. in hunting or fishing," and a "warehouse" is defined as "a structure or room for the storage of merchandise or commodities:  a:  a wholesale establishment of the service type in which large inventories are carried  b:  a whole establishment operated by a chain store organization  c:  a place for the storing of surplus reserve stocks of merchandise by a retail store."[39]  The term "Sportsman's Warehouse" used in connection with retail store services in the field of hunting, fishing, camping and hiking directly conveys the fact that the retail store services feature a large inventory of products for sportsmen.

Based on the evidence in this record, we find that the term SPORTSMAN'S WAREHOUSE in each party's mark is merely descriptive in connection with their respective services. Accordingly, with respect to petitioner's pleaded common law use of the mark SPORTSMAN'S WAREHOUSE, the issue of priority is based on the priority of the acquisition of acquired

---

[39] Webster's Third New International Dictionary of the English Language Unabridged, pp. 2206 and 2576 (1993).  The Board may take judicial notice of dictionary evidence.  *University of Notre Dame du Lac v. J.C. Gourmet Food Imports Co.,* 213 USPQ 594 (TTAB 1982), *aff'd,* 703 F.2d 1372, 217 USPQ 505 (Fed. Cir. 1983).

Cancellation No. 92045000

distinctiveness.  *Perma Ceram Enterprises Inc. v. Preco Industrial Ltd.,* 23 USPQ2d 1134, 1136 (TTAB 1992).[40]

B.  Has petitioner established that SPORTSMAN'S WAREHOUSE, either alone or as part of its registered mark, has acquired distinctiveness in connection with its services?

Petitioner's advertising and revenues in connection with its BASS PRO SHOPS SPORTSMAN'S WAREHOUSE stores has been substantial.  The advertising expenditures and revenues in connection with petitioner's BASS PRO SHOPS SPORTSMAN'S WAREHOUSE stores are summarized in the table below. [41]

| Year | Advertising expenditures | Revenues |
|------|--------------------------|----------|
| 1995 | $615,618 | $29,164,000 |
| 1996 | $600,947 | $36,947,000 |
| 1997 | $598,513 | $41,664,000 |
| 1998 | $649,105 | $46,210,000 |
| 1999 | $731,443 | $46,634,000 |
| 2000 | $860,455 | $49,402,478 |
| 2001 | $1,106,256 | $55,824,093 |

---

[40] We note that in federal court litigation, the courts have generally adopted the rule that the senior user must prove the existence of secondary meaning in its mark at the time and place that the junior user first began use of that mark.  McCarthy on Trademarks and Unfair Competition §16:34 (4th ed. 2007) and the cases cited therein.  As discussed below, however, in this case, the application of the different rules does not yield different results.

[41] Petitioner's Responses to Interrogatory Nos. 7 and 9.  While respondent designated a substantial portion of its testimony and evidence as confidential, petitioner did not designate any testimony and evidence as confidential.  We note petitioner's advertising and revenue figures were set forth in petitioner's Reply Brief, at pages 19 and 20, without any designation that they are considered confidential.

| Year | Advertising expenditures | Revenues |
|------|--------------------------|----------|
| 2002 | $1,091,869 | $62,915,381 |
| 2003 | $1,709,458 | $65,799,989 |
| 2004 | $1,820,417 | $67,171,559 |
| 2005 | $2,063,440 | $69,691,194 |

Petitioner has used newspaper, magazine, radio, Internet, billboards, fliers, and television advertisements to promote its BASS PRO SHOPS SPORTSMAN'S WAREHOUSE stores.[42] However, substantial advertising expenditures and revenues may not, in and of themselves, be sufficient to prove that the mark at issue has acquired distinctiveness. *In re Bongrain International Corp.,* 894 F.2d 1316, 13 USPQ2d 1727, 1729 (Fed. Cir. 1990) (growth in sales may indicate the popularity of the product, rather than trademark significance, or it may indicate acceptance of applicant's other mark on the package); *Goodyear Tire and Rubber Co. v. Interco Tire Corp.,* 49 USPQ2d 1705, 1720 (TTAB 1998) (sales figures may demonstrate popularity or commercial success as opposed to public recognition of trademark rights); *In re Semel,* 189 USPQ 285, 287 (TTAB 1975) (in evaluating advertising figures, it is necessary to also consider not only the extent of advertising but also whether the advertising has been effective in creating an association

---

[42] Petitioner's Response to Interrogatory No. 8; Miller Discovery Dep., p. 23.

between the mark sought to be registered and the goods and/or services).

In the case before us, petitioner's advertising figures are of limited value in establishing the acquired distinctiveness of SPORTSMAN'S WAREHOUSE. Petitioner's advertising does not feature SPORTSMAN'S WAREHOUSE separate and apart from the BASS PRO SHOPS word mark and/or logo and, further, petitioner's CFO, Ms. Miller, could not state whether all of petitioner's advertising even included the SPORTSMAN'S WAREHOUSE phrase.[43]

Although petitioner claimed common law rights in the mark SPORTSMAN'S WAREHOUSE, petitioner's evidence establishes that it has not used this term separate and apart from the BASS PRO SHOPS word mark and/or logo. Rather, it appears only in close proximity to the BASS PRO SHOPS word mark or the BASS PRO SHOPS logo in both petitioner's use of its mark in connection with its retail store services and in its advertising.[44] Moreover, many of petitioner's advertisements prominently feature the BASS PRO SHOPS logo whereas "Bass Pro Shops® Sportsman's Warehouse®"

---

[43] Miller Discovery Dep., pp. 23-24.
[44] Lippelman Discovery Dep., p. 26; Holley Testimony Dep., p. 17. The only evidence of SPORTSMAN'S WAREHOUSE arguably appearing as a stand-alone mark is the sign at petitioner's Memphis store. Prior to the sign change, a SPORTSMAN'S WAREHOUSE sign appeared on the building front; however, an equally large, if not larger, BASS PRO SHOPS logo was displayed over the door. (Lippelman Testimony Dep., Respondent's Exhibit 1009).

is displayed in much smaller type as part of the trade name and address at the bottom of these advertisements.[45] Otherwise, the term "Sportsman's Warehouse" appears below or next to the BASS PRO SHOPS logo.[46] The evidence of the 2006 *Readers' Choice Awards* sponsored by the *Memphis Commercial Appeal* newspaper indicates that third parties sometimes drop the phrase "Sportsman's Warehouse" when referring to petitioner.[47] In that newspaper feature, petitioner was referenced twice: once as the best outdoor store (respondent was identified as a finalist); and, once as a finalist in the sporting goods category. Both times, petitioner was identified as "BASS PRO SHOP" (sic), not BASS PRO SHOPS SPORTSMAN'S WAREHOUSE.

Additionally, in 2002, petitioner closed its SPORTSMAN'S WAREHOUSE in Lawrenceville, Georgia store, thus leaving petitioner with two BASS PRO SHOPS SPORTSMAN'S WAREHOUSE stores. Subsequently, in July 2005, a little more than one month after respondent opened its store in Memphis, Tennessee, petitioner changed the sign on its Memphis store to SPORTSMAN CENTER, and has not changed it back.[48]

---

[45] Lippelman Testimony Dep., Respondent's Exhibit 1009.
[46] Lippelman Testimony Dep., Exhibits 7-9 and 13; Miller Testimony Dep., Exhibits 10-12; Hagale Dep., Exhibits 7-14.
[47] Holley Testimony Dep., Respondent's Exhibit 1000.
[48] We note that petitioner contends that the sign was changed to SPORTSMAN'S CENTER without authorization, and that it continues to reference BASS PRO SHOPS SPORTSMAN'S WAREHOUSE in its advertising. *See* footnote 33.

22

Accordingly, as of the end of 2006, petitioner was operating three SPORTSMAN'S WAREHOUSE stores, but one featured a SPORTSMAN CENTER store sign.

Based on the evidence in this record, we find that consumers do not have an opportunity to disassociate the descriptive term "Sportsman's Warehouse" from the more prominent BASS PRO SHOPS mark and BASS PRO SHOPS logo, and therefore to identify "Sportsman's Warehouse" as a service mark. In other words, there is no direct evidence that consumers view "Sportsman's Warehouse" as a distinctive source indicator for petitioner's services.

Finally, petitioner argued that the evidence of actual confusion is strong evidence that its use of SPORTSMAN'S WAREHOUSE has acquired distinctiveness.[49] However, we find that evidence inconclusive. At the time the first instances of confusion were occurring, the public's exposure to the term "Sportsman's Warehouse" by petitioner and by respondent was comparable, and therefore petitioner's use of the term SPORTSMAN'S WAREHOUSE was not substantially exclusive. Without substantially exclusive use, the term at issue does not point to one unique source. *Levi Strauss & Co. v. Genesco, Inc.,* 742 F.2d 1401, 222 USPQ 939, 940-941 (Fed. Cir. 1984) ("When the record shows that purchasers are confronted with more than one (let alone numerous)

---

[49] Petitioner's Reply Brief, pp. 10-11.

independent users of a term or device, an application for registration under Section 2(f) cannot be successful, for distinctiveness on which purchasers may rely is lacking under such circumstances").

The earliest reported instance of confusion was after petitioner opened its store in St. Charles, Missouri in 2001, at which time respondent reported that customers tried to redeem petitioner's gift cards at its stores.[50]  However, at that time, petitioner had three stores in three states (Lawrenceville, Georgia, Memphis, Tennessee, and St. Charles, Missouri) and respondent had eight stores in four states (3 in Utah, 2 in Idaho, 2 in Colorado, and one in Washington).  Moreover, by 2000, respondent's revenues in its SPORTSMAN'S WAREHOUSE stores exceeded the revenues of petitioner's BASS PRO SHOPS SPORTSMAN'S WAREHOUSE stores.[51] Because the public's exposure to the SPORTSMAN'S WAREHOUSE mark by both parties was comparable, the reported instances of confusion are not probative of whether the term SPORTSMAN'S WAREHOUSE points to one unique source. Moreover, if the instances of confusion were probative that

---

[50] Respondent's Response to Interrogatory No. 3.  Ms. Miller's testimony that the St. Charles store opened in 2001 was based on the information in petitioner's response to Interrogatory No. 2. (Miller Discovery Dep., p. 17).  As explained in more detail in the discussion of petitioner's priority of the mark in its registration *infra*, because of the uncertainty of petitioner's testimony, we consider the effective date of 2001 to be December 31, 2001.
[51] Respondent's Response to Interrogatory No. 7; Utgaard Testimony Dep., Exhibit 14.

the term SPORTSMAN'S WAREHOUSE had acquired distinctiveness, they do not tell us when SPORTSMAN'S WAREHOUSE acquired distinctiveness for purposes of determining priority of acquired distinctiveness.

Petitioner also referenced its likelihood of confusion survey results as strong evidence supporting acquired distinctiveness of the term "Sportsman's Warehouse." The petitioner's likelihood of confusion survey purportedly demonstrated that 35% of the survey respondents believed that respondent's services were "put out" by petitioner.[52] For the same reasons that the reported instances of actual confusion do not persuade us that petitioner's use of "Sportsman's Warehouse" has acquired distinctiveness, the survey does not persuade us.

Petitioner conducted its likelihood of confusion survey between August 18, 2006 and August 29, 2006. At that time, respondent had 48 SPORTSMAN'S WAREHOUSE stores in 23 states and petitioner had 3 BASS PRO SHOPS SPORTSMAN'S WAREHOUSE stores in 3 states and petitioner's store in Memphis, Tennessee did not have a SPORTSMAN'S WAREHOUSE sign. Moreover, respondent's revenues for its SPORTSMAN'S WAREHOUSE stores, which are substantial by any standard, far exceed petitioner's revenues for its BASS PRO SHOPS

---

[52] *See* the discussion *infra.*

SPORTSMAN'S WAREHOUSE stores.[53]  Accordingly, at the time of the likelihood of confusion survey, the public's exposure to respondent's use of the term "Sportsman's Warehouse" exceeded that of the petitioner, thus undercutting petitioner's argument that SPORTSMAN'S WAREHOUSE is associated with a single source.

In view of the foregoing, especially the fact that there is no evidence that petitioner advertises or uses SPORTSMAN'S WAREHOUSE independently from the BASS PRO SHOPS mark or the BASS PRO SHOPS logo, and the fact that there is no evidence that measures or demonstrates the extent to which consumers perceive petitioner's use of SPORTSMAN'S WAREHOUSE as a trademark, petitioner has failed to prove that SPORTSMAN'S WAREHOUSE, either alone or as part of its registered mark, has acquired distinctiveness.  Because petitioner has failed to demonstrate that, through its use, SPORTSMAN'S WAREHOUSE has acquired distinctiveness, it has failed to meet its burden of showing that the term SPORTSMAN'S WAREHOUSE had acquired distinctiveness as a trademark prior to the filing date of respondent's underlying application, and therefore has failed to prove priority through its common law rights in the mark SPORTSMAN'S WAREHOUSE.

---

[53] Respondent's Response to Interrogatory No. 7; Utgaard Testimony Dep., Exhibit 14.

C.   Has petitioner established prior use of the mark in its pleaded registration?

As indicated *supra,* in a cancellation proceeding, petitioner does not necessarily have priority simply because it owns a registration. *Brewski Beer Co. v. Brewski Brothers, Inc.*, 47 USPQ2d at 1284.  *See also Henry Siegel Co. v. M & R Mfg. Co.,* 4 USPQ2d 1154, 1160 n.9 (TTAB 1987); *American Standard Inc. v. AQM Corp.,* 208 USPQ 840, 841-842 (TTAB 1980); *SCOA Industries Inc. v. Kennedy & Cohen, Inc.,* 188 USPQ 411, 413 (TTAB 1975).  The filing date of petitioner's pleaded registration is March 1, 1996, which predates the filing date of respondent's underlying registration (January 22, 1999).  However, Marie Antoinette Miller, petitioner's CFO, testified that petitioner first used the mark in petitioner's pleaded registration on March 1, 1995.[54]  Exhibit 10 from Ms. Miller's testimony deposition is an excerpt from the Bass Pro Shops 1995 catalog featuring an advertisement containing petitioner's registered mark and promoting the opening of the Bass Pro Shops Sportsman's Warehouse in Lawrenceville, Georgia on March 1, 1995.[55]

---

[54] Footnote 15 *supra.*  Service mark use is found when the mark is used or displayed in the sale or advertising of services and the services have been rendered in commerce.  Section 45 of the Trademark Act of 1946, 15 U.S.C. §1127.

[55] Although petitioner began advertising the opening of its BASS PRO SHOPS SPORTSMANS' WAREHOUSE store before March 1, 1995, it does not rise to the level of "use analogous to trademark use." Use analogous to trademark use "is non-technical use of a

Because petitioner has established that it has continuously used its registered mark since March 1, 1995, respondent must establish that it made continuous use of its registered mark prior to March 1, 1995. If respondent can prove that it did, then petitioner's Section 2(d) claim must fail because petitioner would not have proven priority of use. *Brewski Beer Co. v. Brewski Brothers, Inc.*, 47 USPQ2d at 1283-1284.

Based on the record before us, respondent has not established first use of its registered mark prior to petitioner's date of first use. Stuart Utgaard testified that respondent first used the term SPORTSMAN'S WAREHOUSE in February or March, 1995, prior to petitioner's filing date, when respondent changed the sign on its store.[56] However, respondent's first use of the term SPORTSMAN'S WAREHOUSE *per*

---

trademark in connection with the promotion or sale of a product under circumstances which do not provide a basis for an application to register, usually because the statutory requirement for use on or in connection with the sale of goods in commerce has not been met." *Shalom Children's Wear Inc. v. In-Wear A/S,* 26 USPQ2d 1516, 1519 (TTAB 1993). Use analogous to trademark use is proven by advertising of sufficient clarity and repetition to create the required identification by a substantial portion of the public that might be expected to purchase the service. *T.A.B. Systems v. PacTel Teletrac,* 77 F.3d 1372, 37 USPQ2d 1879, 1883 (Fed. Cir. 1996). In this case, there is no evidence regarding the extent or effect of petitioner's pre-opening advertising, and therefore petitioner has not shown use analogous to trademark use prior to March 1, 1995.

[56] *See* footnote 14 *supra.* Dale Smith specifically referenced spring 1995. Respondent's testimony regarding its use of SPORTSMAN'S WAREHOUSE prior to February or March 1995 is not sufficiently clear, consistent, or convincing to be probative. *See* Utgaard Discovery Dep., pp. 23, 76, and Utgaard Testimony Dep., pp. 79-80 and Exhibit 44.

*se* is not at issue because we are concerned with respondent's first use of its registered word and design mark.

The record is not clear as to when respondent began using its registered mark. The relevant testimony and evidence is set forth below:

1. "During 1995, after Sportsman's Warehouse had adopted the mark SPORTSMAN'S WAREHOUSE, it designed and began using the Respondent's mark in connection with the sale and advertising of the services identified in Registration No. 2,390,988";[57]

2. "At the time after Stu bought us, he asked my wife, who happened to do all the advertising at that time to come up with a logo, basically with our printer. . . . They designed it, still using the words and then the departments underneath, hunting, fishing, camping, and the mountains in the background. They presented it Stu, he liked it, and it became the mark";[58] and,

3. "And so that when we purchased the business on November of '96, the had already designed this [respondent's registered mark]."[59]

---

[57] Respondent's Response to Interrogatory No. 5.
[58] Dale Smith Discovery Dep., pp. 9-10.
[59] Utgaard Testimony Dep., p. 80.

In its brief, respondent explained that "[a]t the time of the registration, Respondent's best specimen of use for the mark was its Father's Day advertisement published on June 15, 1995 in the publication *Desert News* distributed in the Salt Lake City, Utah area. (Citation omitted). This specimen and its date were used as the date of first use within Respondent's trademark application."[60]

Because respondent is seeking to prove a date of first use earlier than the date alleged in its application for registration (June 16, 1995), its proof of that earlier date must be "clear and convincing." *Hydro-Dynamics Inc. v. George Putnam & Co.*, 811 F.2d 1470, 1 USPQ2d 1772, 1773 (Fed. Cir. 1987) (dates of first use earlier than that alleged in the application is a change of position from one "considered to have been made against interest at the time of filing the application," and therefore requires enhanced proof); *Ilco Corp. v. Ideal Security Hardware Corp.*, 527 F.2d 1221, 188 USPQ 485, 488 (CCPA 1976).

Respondent's June 15, 1995 date of first use is clearly subsequent to March 1, 1995, petitioner's date of first use. Moreover, even if we used the February/March, 1995 date of respondent's first use of the term "Sportsman's Warehouse," we would still find that petitioner had priority because respondent's testimony is not clear and convincing. *See*

---

[60] Respondent's Brief, p. 6.

*National Bank Book Co. v. Leather Crafted Products, Inc.,* 218 USPQ 826, 828 (TTAB 1993) (oral testimony may be sufficient to prove the first use of a party's mark when it is based on personal knowledge, it is clear and convincing, and it has not be contradicted); *Liqwacon Corp. v. Browning-Ferris Industries, Inc.,* 203 USPQ 305, 316 (TTAB 1979) (oral testimony may be sufficient to establish both prior use and continuous use when the testimony is proffered by a witness with knowledge of the facts and the testimony is clear, convincing, consistent, and sufficiently circumstantial to convince the Board of its probative value); *GAF Corp. v. Anatox Analytical Services, Inc.,* 192 USPQ 576, 577 (TTAB 1976) (oral testimony may establish prior use when the testimony is clear, consistent, convincing, and uncontradicted). In view of the uncertainty of respondent's testimony and lack of documentation, we conclude that respondent's date of first use can be no earlier than March 31, 1995, the last day of the specified time period identified in Mr. Utgaard's testimony. *EZ Loader Boat Trailers, Inc. v. Cox Trailers, Inc.,* 213 USPQ 597, 598 n.5 (TTAB 1982) (documentary evidence showed first use in 1977, the month and day were unknown, therefore, the Board could not presume any date earlier than the last day of the proved period). *See also Osage Oil & Transportation, Inc. v. Standard Oil Co.,* 226 USPQ 905, 911 n.22 (TTAB 1985)

(evidence established first use in 1968-1969, therefore December 31, 1969 is date of first use). Inasmuch as respondent's testimony regarding its first use of its registered mark is not "clear and convincing," respondent failed to meet its burden of establishing a date of first use earlier than that claimed in its application for registration, or prior to petitioner's proven date of first use for its registered service mark.

In view of the foregoing, petitioner has proven priority of use of the mark in its pleaded registration. Accordingly, we will consider the issue of likelihood of confusion between the mark in petitioner's pleaded registration and the mark in respondent's registration.

Likelihood of Confusion

Our determination under Section 2(d) is based on an analysis of all of the probative facts in evidence that are relevant to the factors bearing on the issue of likelihood of confusion. *In re E. I. du Pont de Nemours & Co.,* 476 F.2d 1357, 177 USPQ 563, 567 (CCPA 1973). *See also, In re Majestic Distilling Company, Inc.,* 315 F.3d 1311, 65 USPQ2d 1201, 1203 (Fed. Cir. 2003). In any likelihood of confusion analysis, two key considerations are the similarities between the marks and the similarities between the goods. *See Federated Foods, Inc. v. Fort Howard Co.,* 544 F.2d 1098, 192 USPQ 24, 29 (CCPA 1976) ("The fundamental inquiry

mandated by §2(d) goes to the cumulative effect of differences in the essential characteristics of the goods and differences in the marks").

A.  The similarity or dissimilarity and nature of the services.

Respondent's mark is registered for, as amended, "retail stores featuring hunting supplies, fishing supplies, camping supplies, reloading supplies, outerwear clothing and footwear."  Petitioner's pleaded registration is for "retail stores featuring clothing, fishing supplies and sporting goods."  The services are identical in part.

B.  The similarity or dissimilarity of established, likely-to-continue trade channels and classes of consumers.

There are no restrictions in either party's registration as to the channels of trade or classes of purchasers, therefore, we must consider the retail store services of both petitioner and respondent as if they were rendered in all of the normal channels of trade to all of the normal purchasers of such services.  *Canadian Imperial Bank of Commerce v. Wells Fargo Bank,* 811 F.2d 1490, 1 USPQ2d 1813, 1815 (Fed. Cir. 1987); *Toys R Us v. Lamps R Us,* 219 USPQ 340, 343 (TTAB 1983).  Moreover, because the services are in part identical, we must presume that the channels of trade and classes of purchasers are the same. *Genesco Inc. v. Martz,* 66 USPQ2d 1260, 1268 (TTAB 2003) ("Given the in-part identical and in-part related nature of

the parties' goods, and the lack of any restrictions in the identifications thereof as to trade channels and purchasers, these clothing items could be offered and sold to the same classes of purchasers through the same channels of trade"); *In re Smith and Mehaffey,* 31 USPQ2d 1531, 1532 (TTAB 1994) ("Because the goods are legally identical, they must be presumed to travel in the same channels of trade, and be sold to the same class of purchasers").

C.  The similarity or dissimilarity of the marks in their entireties as to appearance, sound, connotation and commercial impression.

We now turn to the *du Pont* likelihood of confusion factor focusing on the similarity or dissimilarity of the marks in their entireties as to appearance, sound, connotation and commercial impression. *In re E. I. du Pont De Nemours & Co.,* 177 USPQ at 567. In a particular case, any one of these means of comparison may be critical in finding the marks to be similar. *In re White Swan Ltd.,* 9 USPQ2d 1534, 1535 (TTAB 1988); *In re Lamson Oil Co.,* 6 USPQ2d 1041, 1042 (TTAB 1988). In comparing the marks, we are mindful that where, as here, the services are identical, "the degree of similarity necessary to support a conclusion of likely confusion declines." *Century 21 Real Estate Corp. v. Century Life of America,* 970 F.2d 874, 23 USPQ2d 1698, 1700 (Fed. Cir. 1992). *See also Real Estate One, Inc. v. Real Estate 100 Enterprises Corporation,* 212 USPQ 957, 959

(TTAB 1981); *ECI Division of E-Systems, Inc. v. Environmental Communications Incorporated,* 207 USPQ 443, 449 (TTAB 1980).

In addition, the test is not whether the marks can be distinguished when subjected to a side-by-side comparison, but rather whether the marks are sufficiently similar in terms of their overall commercial impression so that confusion as to the source of the goods offered under the respective marks is likely to result. *San Fernando Electric Mfg. Co. v. JFD Electronics Components Corp.,* 565 F.2d 683, 196 USPQ 1, 3 (CCPA 1977); *Spoons Restaurants Inc. v. Morrison Inc.,* 23 USPQ 1735, 1741 (TTAB 1991), *aff'd unpublished,* No. 92-1086 (Fed. Cir. June 5, 1992). The proper focus is on the recollection of the average customer, who retains a general rather than specific impression of the marks. *Winnebago Industries, Inc. v. Oliver & Winston, Inc.,* 207 USPQ 335, 344 (TTAB 1980); *Sealed Air Corp. v. Scott Paper Co.,* 190 USPQ 106, 108 (TTAB 1975).

As discussed above, the term "Sportsman's Warehouse" is merely descriptive of retail store services in a warehouse style featuring hunting, fishing, and camping products and both parties have disclaimed the exclusive right to use this term apart from their respective marks as a whole. A descriptive feature of a mark is entitled less weight than inherently distinctive elements. *In re National Data Corp.,*

753 F.2d 1056, 224 USPQ 749, 751 (Fed. Cir. 1985) ("there is nothing improper in stating that, for rational reasons, more or less weight has been given to a particular feature of a mark, provided that the ultimate conclusion rests on consideration of the marks in their entireties"). Moreover, it is well settled that when a mark, or a portion of a mark, is inherently weak, it is entitled to a narrow scope of protection. In other words, when a business adopts a mark incorporating a descriptive term, it assumes the risk that competitors may also use that descriptive term. *Milwaukee Nut Co. v. Brewster Food Service,* 277 F.2d 190, 125 USPQ 399, 401 (CCPA 1960) (opposer acted at its peril in choosing a highly suggestive mark). *See also Sure-Fit Products Co. v. Saltzon Drapery Co.,* 254 F.2d 158, 117 USPQ 295, 296 (CCPA 1958) (competitors may come closer to the senior mark without creating a likelihood of confusion than would be the case with a strong mark).

With respect to petitioner's mark, the BASS PRO SHOPS logo, consisting of words and a design, is the dominant element of the mark. "Sportsman's Warehouse" is featured as a descriptive term that appears smaller than and below the BASS PRO SHOPS logo. On the other hand, in respondent's mark, the term SPORTSMAN'S WAREHOUSE is the dominant element of the mark because it is the largest part of the mark and it is that part of the mark that consumers will use in

36

calling for respondent's services.  The words "Hunting,
Fishing, Camping, Reloading, Outerwear, Footwear" appearing
under the word "Warehouse" are extremely small and merely
describe the types of products sold by respondent.  The
drawing of the mountain emphasizes that respondent's
services are directed to people involved with outdoor sports
such as hunting, fishing, camping and hiking.[61]

In terms of appearance and sound, the marks are similar
by virtue of the fact that they share the descriptive term
"Sportsman's Warehouse."  However, we find that the marks
otherwise look and sound different due the presence of the
arbitrary and distinctive BASS PRO SHOPS logo and
respondent's highly stylized presentation.  On balance, we
find that the visual and aural differences that result from
the presence of the BASS PRO SHOPS logo and respondent's
highly stylized presentation outweigh the similarity in
appearance and sound resulting from the common appearance of
the descriptive term "Sportsman's Warehouse."

Likewise, we find that the two marks, when viewed in
their entireties, are dissimilar in terms of connotation and
overall commercial impression.  Any similarity that results
from the presence of the descriptive term "Sportsman's
Warehouse" is outweighed by the BASS PRO SHOPS logo in the
petitioner's mark and the stylized elements of respondent's

---

[61] *See* the definition of "sportsman" *supra* at page 18.

mark. The BASS PRO SHOPS logo creates an overall meaning and commercial impression that is totally absent from respondent's mark. The BASS PRO SHOPS logo specifically engenders the commercial impression of a professional fisherman's sports center store. On the other hand, the reference to fishing in the informational wording at the bottom of respondent's mark is a minor part of the impression of that mark. Moreover, the mountain design in respondent's mark engenders a totally different commercial impression.

In view of the foregoing, we find that when viewed in their entireties, petitioner's mark and respondent's mark are not similar.

D. The nature and extent of any actual confusion.

Petitioner has introduced evidence of actual confusion based on each party's use of the term "Sportsman's Warehouse."[62] However, the instances of confusion were based on the term "Sportsman's Warehouse," not on the marks at issue: the marks in petitioner's registration and respondent's registration. With respect to the instances of confusion based on the use of the term "Sportsman's Warehouse" *per se,* that term is merely descriptive, it has not acquired distinctiveness, and therefore petitioner does not have the exclusive right to use "Sportsman's Warehouse."

---

[62] *See* the Bome, McRae, Perez, and Otte discovery depositions.

Accordingly, the testimony regarding actual confusion is of little probative value.

On the other hand, the likelihood of confusion survey conducted on behalf of petitioner by Michael B. Mazis, Ph.D., was based on the mark in petitioner's registration. Dr. Mazis conducted a mall intercept survey in 15 cities among 396 people aged 18 or older who had purchased fishing, hunting, camping, or other outdoor gear in the past 12 months.[63]

> Respondents were first shown the "Bass Pro Shops Sportsman's Warehouse" logo. Then, respondents were exposed to an array of six logos that they would be likely to encounter in shopping for outdoor gear.[64] Among these six logos was the logo put out by Sportsman's Warehouse, Inc. To assess potential confusion between the petitioner's and the registrant's marks, all survey respondents were asked whether any of the six logos in front of them either (1) is put out, (2) needed permission or approval, or (3) is affiliated with the company that puts out the logo that they had seen earlier ("Bass Pro Shops Sportsman's Warehouse" logo). Adjusting for the control cell, over 35% of the outdoor gear purchasers felt that the Sportsman's Warehouse, Inc.'s logo was put out by the same company that put out the "Bass Pro Shops Sportsman's

---

[63] Mazis Testimony Dep., Exhibit 3, Expert Report of Michael B. Mazis, Ph.D., p. 14.
[64] All the respondents were shown the L.L. Bean logo (block letters), the Cabela's logo (script letters), the Academy Sports Outdoors and A logo (block letters), The Dick's Sporting Goods logo (block letters, but the apostrophe comprises a basketball and soccer ball), and the Scheels logo (block letters). The control group was shown the Gander Mtn. Logo with the drawing of a flying goose in a circle. The test group was shown respondent's mark.

Warehouse" logo.  In addition, adjusting for the control cell, 30% of outdoor gear purchasers either felt that the Sportsman's Warehouse, Inc.'s logo (1) is put out, (2) needed permission or approval, or (3) is affiliated with the same company that puts out the "Bass Pro Shops Sportsman's Warehouse" logo.  In addition, respondents were asked their reasons for selecting the Sportsman's Warehouse, Inc. logo from the array.  My analysis revealed that 22% of the respondents who had indicated that the Sportsman's Warehouse, Inc. logo and the "Bass Pro Shops Warehouse" logo had a common source or were somehow connected mentioned that similarity of the names were the reason.[65]

It was not surprising that a significant segment of the survey respondents believed that there was some affiliation between petitioner and respondent.  Because the only similarity between any of the 7 marks in the survey was that petitioner's mark and respondent's mark both feature the term "Sportsman's Warehouse," this would suggest to some survey respondents that they should find an affiliation between those two marks.  For this reason, we find the survey results to be of little probative value.

Moreover, of the survey respondents in both the test group and the control group who thought that one or more of the logos were "put out" by the same company that owns the

---

[65] Mazis Testimony Dep., Exhibit 3, Expert Report of Michael B. Mazis, Ph.D., p. 14. By our count, 59 (65%) of the survey respondents who said that respondent's mark was put out by petitioner "mentioned that similarity of the names" or something similar.

"Bass Pro Shops Sportsman's Warehouse" logo, 64 identified Cabela's, 30 identified Academy Sports, and 30 identified Dick's Sporting Goods. That so many people could believe that the Cabela's, Academy Sports, and Dick's Sporting Goods logos were "put out" by the same company that owns the "Bass Pro Shops Sportsman's Warehouse logo, suggests that those survey respondents perceived the term "Sportsman's Warehouse" to be descriptive and not a source identifier.

The fact that there may be evidence of confusion due to the concurrent use of a descriptive term is insufficient to warrant finding that there is a legally recognizable likelihood of confusion where the marks as a whole are visually and aurally distinguishable. *See also Otto Roth & Co., Inc. v. Universal Foods Corp.,* 640 F.2d 1317, 209 USPQ 40, 43-45 (CCPA 1981) (likelihood of confusion cannot be recognized where plaintiff does not have a proprietary right in the term upon which it bases the likelihood of confusion); *Cambridge Filter Corporation v. Servodyne Corporation,* 189 USPQ 99, 103-104 (TTAB 1975) ("opposer has not acquired a proprietary right or secondary meaning in the suffix 'CAP' or 'FLO' in the air filter field and that the inclusion in each of the parties' marks here involved of the 'CAP' and 'FLO' suffix cannot serve, per se, as a basis upon which to predicate a holding of conflict among the marks").

41

To the extent that petitioner has established actual confusion, it is confusion resulting from the common use of this merely descriptive term for which petitioner has not acquired distinctiveness.  Thus, petitioner assumed this risk in using a descriptive term as part of its mark.

E.   Balancing the factors.

Balancing all of the relevant likelihood of confusion factors, we find that the marks are sufficiently dissimilar that no confusion is likely to result even though the marks are used in connection with identical services.  In reaching this conclusion, we have given great weight to the fact that "Sportsman's Warehouse" is a descriptive term that has not acquired distinctiveness.

In reaching this decision, we are cognizant that we must analyze the marks in their entireties, including the descriptive term "Sportsman's Warehouse."  "Without question, the descriptive or generic character of an expression which forms part of both marks under consideration is pertinent to the issue of likelihood of confusion."  *In re National Data Corp.,* 224 USPQ at  751. In *National Data Corp.,* the simultaneous use of the descriptive term "Cash Management" in connection with "The Cash Management Exchange," on the one hand, and "Cash Management Account," on the other, served to create similar commercial impressions in the marks at issue.  *Compare In re*

42

*Bed & Breakfast Registry,* 791 F.2d 157, 229 USPQ 818 819 (Fed. Cir. 1986) (in finding that BED & BREAKFAST REGISTRY and BED & BREAKFAST INTERNATIONAL, for similar services, are not likely to cause confusion, the Court said that "travelers acquainted with the term 'bed and breakfast' are more likely to rely on the noncommon portion of each mark, e.g., 'registry' vs. 'international', to distinguish among services"). As we found when discussing the similarity of the marks, the simultaneous use of the descriptive term "Sportsman's Warehouse" does not create marks that engender similar commercial impressions.

In view of the foregoing, respondent's use of SPORTSMAN'S WAREHOUSE and design, in connection with retail stores featuring hunting supplies, fishing supplies, camping supplies, reloading supplies, outerwear clothing and footwear, does not so resemble petitioner's mark BASS PRO SHOPS SPORTSMAN'S WAREHOUSE and design, in connection with "retail stores featuring clothing, fishing supplies and sporting goods," as to be likely to cause confusion.[66]

### Fraud

Petitioner alleged that respondent never used its mark in connection with wholesale stores, and therefore committed fraud on the U.S. Patent and Trademark Office by signing the

---

[66] Because we have found that there is no likelihood of confusion, we need not address respondent's laches affirmative defense.

declaration in the application as to the truth of the statements contained therein that includes wholesale stores in its description of services.[67] Fraud in procuring a trademark registration occurs when an applicant for registration knowingly makes false, material representations of fact in connection with an application to register. *Torres v. Cantine Torresella S.r.L.,* 808 F.2d 46, 1 USPQ2d 1483, 1484 (Fed. Cir. 1986); *Standard Knitting, Ltd. v. Toyota Jidosha Kabushiki Kaisha,* 77 USPQ2d 1917, 1926 (TTAB 2006); *Medinol Ltd. v. Neuro Vasx, Inc.,* 67 USPQ2d at 1209. A party making a fraud claim is under a heavy burden because fraud must be proved by clear and convincing evidence, leaving nothing to speculation, conjecture, or surmise. Any doubt must be resolved against the party making the claim. *Standard Knitting, Ltd. v. Toyota Jidosha Kabushiki Kaisha,* 77 USPQ2d at 1926; *Smith International, Inc. v. Olin Corporation,* 209 USPQ 1033, 1043-1044 (TTAB 1981).

Respondent filed a use-based application to register its mark for "retail and wholesale stores featuring hunting supplies, fishing supplies, camping supplies, reloading supplies, outerwear clothing and footwear." In response to petitioner's Interrogatory No. 8, respondent stated "it sells goods only at retail and does not sell goods at a

---

[67] Petitioner's Brief, pp. 23-25.

wholesale level."[68]   Indeed, many of respondent's witnesses

testified that respondent is a retailer, not a wholesaler.[69]

However, respondent subsequently amended its answer to

Interrogatory No. 8 to read as follows, so far as pertinent:

> Sportsman's Warehouse responds that it
> takes the phrase "under Respondent's
> mark" to refer to sales of goods
> actually bearing Respondent's mark, such
> as logoed products.  Respondent does not
> sell logoed products as a wholesaler.
> Respondent has, however, from time to
> time sold goods at wholesale.
> Respondent states that its parent
> company, Sportsman's Warehouse Holdings,
> Inc., engages in wholesale sales through
> its subsidiary Pacific Flyway.  Pacific
> Flyway was affiliated with Sportsman's
> Warehouse prior to December 16, 1998.
> During that time, it was the business of
> Pacific Flyway to at times send
> wholesale customers to Sportsman's
> Warehouse when Pacific Flyway was out of
> stock in a required item.  Sportsman's
> Warehouse would then sell items to such
> customers at wholesale.  Prior to
> December 16, 1998, Sportsman's Warehouse
> would also at times sell items in volume
> to certain customers at wholesale.[70]

Stuart Utgaard and Dale Smith further testified that

when Stuart Utgaard bought respondent in 1996, respondent

and Pacific Flyway were in adjoining buildings in Midvale,

---

[68] Interrogatory No. 8 requests that respondent identify the customers to whom it "has sold goods at wholesale under Respondent's Mark."
[69] Bome Dep., pp. 33-35; McRae Dep., p. 28; Perez Dep., p. 26; Otte Dep. p. 28.
[70] Respondent's witnesses corroborated the amended interrogatory response.  *See* Dale Smith Discovery Dep., pp. 12-13, 24-25; Dale Smith Testimony Dep., pp. 13-15 ("We were a common source for a lot of mom-and-pop shops"); Stuart Utgaard Discovery Dep., pp. 19, 24-28, 56-59; Stuart Utgaard Testimony Dep., pp. 93-96; Nielsen Dep., pp. 4-6, 11-12.

Utah, and Pacific Flyway routinely referred customers to respondent for wholesale sales.[71] Subsequently, respondent phased out wholesale sales after respondent relocated its Midvale, Utah store in 2000 or 2001;[72] however, even today, some smaller retailers purchase a quantity of products for resale from respondent at a discount.[73]

Q. Were you, were you personally ever a witness to a wholesale sale being made through Sportsman's Warehouse retail outlet? You personally?

A. Yes.

Q. Okay, when was that?

A. Like I said, when we first bought the company, smaller dealers would come in here and, especially from outlying areas, like, take Evanston, Wyoming, they would come to our store and say a guy wanted to stock up on tackle boxes for his store. He might want to buy thirty tackle boxes. Well, if you're a fishermen (sic), most guys aren't going to go fishing with thirty tackle boxes. Okay? He's going to buy them, put them in his

---

[71] Dale Smith Discovery Dep., p. 25; Stuart Utgaard Discovery Dep., pp. 19, 25
[72] Stuart Utgaard Discovery Dep., pp. 24-25.
[73] Stuart Utgaard Testimony Dep., pp. 93-96.

store, and resell them. So you would come in want some kind of special price on something. We might give him 5 percent off, 10 percent off, or whatever, and he'd take it and go resell it.

Q. But you wouldn't know for sure who he resold it to or whether he even resold it all?

A. In the early days, like I say, smaller stores would come to our store and buy product for resale. So it's like a wholesale sale. We did not break those out as wholesale - - we didn't have a category to try and keep track of it because a guy is buying it on his credit card. Sometime it might be, you know, Busy Beaver's Sport Shop. A guy down in Beaver, Utah, might come in and he would buy this product, and he'd write a check from Beaver Sport Shop to Sportsman's Warehouse for whatever he bought. And those used to occur weekly, daily.[74]

The testimony of respondent's witnesses Bome, McRae, Perez and Otte is not sufficient for us to find that respondent committed fraud when it filed its application that included wholesale stores in the description of

---

[74] Stuart Utgaard Testimony Dep., pp. 94-96.

47

services.  Bome began working in respondent's Clackamas, Oregon store in July 2003.[75]  McRae began working in respondent's Grand Junction, Colorado store in November 2001.[76]  Perez began working in respondent's Riverdale, Utah store in 1999.[77]  Otte began working in respondent's St. Cloud, Minnesota store in August or September 2002.[78]  The testimony of these witnesses was limited to their personal experiences.  Fed. R. Evid. 701.  In fact, Perez specifically testified that "I didn't know anything about their Midville (sic) store."  Accordingly, there is no foundation to establish that these witnesses had any knowledge regarding respondent's wholesale activities, or lack thereof, prior to their employment, or whether wholesale activities may have occurred in Midvale, Utah or in any other store where they did not work.

On the other hand, the testimony of Dale Smith and Stuart Utgaard establishes that respondent rendered wholesale store services prior to the filing and issuance of its registration sufficient to support the inclusion of "wholesale stores" in its application.[79]  We agree with

---

[75] Bome Dep., p. 12.
[76] McRae Dep., p. 9.
[77] Perez Dep., p. 14.
[78] Otte Dep., p. 27.
[79] We do not find persuasive respondent's explanation that "it takes the phrase 'under Respondent's mark' to refer to sales of goods actually bearing Respondent's mark, such as logoed products."  The interrogatory is clear that petitioner was inquiring as to the identity or nature of the customers to whom respondent made wholesale sales.  Accordingly, we give that

48

petitioner that respondent's testimony is self-serving, but it is credible.  Unlike petitioner, we do not find it "disingenuous."[80]  Further, while respondent could have filed an amendment to its description of services to delete "wholesale services" under Section 7 of the Trademark Act as soon as it stopped using its mark in connection with such services, it was also reasonable for respondent to do so when it filed its declaration of use under Section 8 of the Trademark Act.  Thus, we cannot infer fraud in this instance.  Because fraud must be proved by clear and convincing evidence, leaving nothing to speculation, conjecture, or surmise, petitioner has failed to meet its burden of proof that respondent committed fraud in the filing of its application for registration.

Decision:  The petition for cancellation is dismissed with prejudice.

---

portion of respondent's testimony and evidence no further consideration.
[80] Petitioner's Reply Brief, p. 21.